OPINION OF THE COURT
STAPLETON, Circuit Judge:
This is a civil rights action arising out of the shooting of a pet dog. The plaintiffs/appellants are Kim and David Brown, the owners of the pet. Police Officer Robert Eberly is alleged to be the primary constitutional tortfeasor. Officer Eberly’s employer, Muhlenberg Township, its Board of Supervisors, and two of its Chiefs of Police are also alleged to be responsible for Officer Eberly’s constitutional torts on various theories. Additionally, the Browns assert a state law claim. The District Court granted summary judgment to the defendants on all claims.
We first address the facts and law concerning whether a constitutional violation occurred. We then examine whether the defendants other than Officer Eberly share responsibility for any constitutional violations that may have occurred. Finally, we focus on the state law claim. Because this case comes to us on appeal from the District Court’s grant of summary judgment to the defendants, we view the facts in the light most favorable to the Browns, drawing every reasonable inference in their favor. See Beers-Capitol v. Whetzel, 256 F.3d 120, 130 n. 6 (3d Cir.2001).
I. FACTS
The Browns lived in a residential section of Reading, Pennsylvania. On the morning of April 28, 1998, they were in the process of moving. Kim was upstairs packing, while David was loading the car. Immi, their three year old Rottweiler pet, had been placed in the Browns’ fenced yard. Although the Browns had not secured a dog license for her, Immi wore a bright pink, one inch wide collar with many tags: her rabies tag, her microchip tag, a guardian angel tag, an identification *209 tag with the Browns’ address and telephone number, and the Browns’ prior Rottweiler’s lifetime ■ license. Unbeknownst to the Browns, the latch on the back gate of their fence had failed, and Immi had wandered into the adjacent parking lot beyond the fence.
A stranger parked in the lot observed Immi as she wandered about in it. After three or four minutes of sniffing and casually walking near the fence, Immi approached the sidewalk along the street on which the Browns lived. As she reached the curb, Officer Eberly was passing in his patrol' car. Seeing Immi, he pulled over, parked across the street, and approached her. He clapped his hands and called to her. Immi barked several times and then withdrew, circling around a vehicle in the parking lot that was approximately twenty feet from the curb. Having crossed the street and entered the parking lot, Officer Eberly walked to a position ten to twelve feet from Immi. Immi was stationary and not growling or barking. According to the stranger observing from his car, Immi “did not display any aggressive behavior towards [Officer Eberly] and never tried to attack him.”
At this point, Kim Brown looked out of an open, screened window of her house. She saw Officer Eberly not more than fifty feet away. He and Immi were facing one another. Officer Eberly reached for his gun. Kim screamed as loudly as she could, “That’s my dog, don’t shoot!” Her husband heard her and came running from the back of the house. Officer Eberly hesitated a few seconds and then pointed his gun at Immi. Kim tried to break through the window’s screen and screamed, “No!”
Officer Eberly then fired five shots at Immi. Immi fell to the ground immediately after the first shot, and Officer Eberly continued firing as she tried to crawl away. One bullet entered Immi’s right mid-neck region; three or four bullets entered Immi’s hind end.
Immi had lived with the Browns preschool aged children for most of her three years and had not previously been violent or aggressive towards anyone.
Based on these facts and the reasonable inferences that can be drawn from them, we are thus faced with a situation in which a municipal law enforcement officer intentionally and repeatedly shot a pet without any provocation and with knowledge that it belonged to the family who lived in the adjacent house and was available to take custody.
II. OFFICER EBERLY
A. Unreasonable Seizure
The Browns claim that Officer Eberly violated their constitutionally secured right to be free from unreasonable governmental seizures of their property. The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.... ” The people’s “effects” include their personal property. See United States v. Place, 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (detention of luggage held to be a Fourth Amendment seizure). A Fourth Amendment “seizure” of personal property occurs when “there is some meaningful interference with an individual’s possessory interests in that property.” United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Destroying property meaningfully interferes with an individual’s possessory interest in that property. See id. at 124-25, 104 S.Ct. 1652. “[T]he destruction of *210 property by state officials poses as much of a threat, if not more, to people’s right to be ‘secure ... in their effects’ as does the physical taking of them.” Fuller v. Vines, 36 F.3d 65, 68 (9th Cir.1994).
The Browns had a possessory interest in their pet. In Pennsylvania, by statute, “All dogs are ... declared to be personal property and subjects of theft.” 3 Pa. Stat. Ann. § 459-601(a). See Miller v. Peraino, 426 Pa.Super. 189, 626 A.2d 637, 640 (1993); Daughen v. Fox, 372 Pa.Super. 405, 539 A.2d 858, 864 n. 4 (1988).[1] It necessarily follows that Immi was property protected by the Fourth Amendment and that Officer Eberly’s destruction of her constituted a Fourth Amendment seizure. Accordingly, we join two of our sister courts of appeals in holding that the killing of a person’s dog by a law enforcement officer constitutes a seizure under the Fourth Amendment. Fuller, 36 F.3d at 68; Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir.1994).
To be constitutionally permissible, then, Officer Eberly’s seizure must have been “reasonable.” “In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.” Place, 462 U.S. at 701, 103 S.Ct. 2637. Where the governmental interest justifying a seizure is sufficiently compelling and the nature and extent of the intrusion occasioned by the seizure is not disproportionate to that interest, the seizure may be reasonable even though effected without a warrant. Thus, when the state claims a right to make a warrantless seizure, we “must balance the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.” Id. at 703, 103 S.Ct. 2637. Even when the state’s interest is sufficiently compelling to justify a warrantless seizure that is minimally intrusive, the seizure will be unreasonable if it is disproportionately intrusive. While the state’s interest in drug interdiction, for example, is sufficient to render reasonable a brief but warrant-less detention of suspicious luggage for a canine “sniff,” such detention for ninety minutes constitutes an unreasonable seizure under the Fourth Amendment. Id.
Where a pet is found at large, the state undoubtedly has an interest in restraining it so that it will pose no danger to the person or property of others. The dog catcher thus does not violate the Fourth Amendment when he or she takes a stray into custody. Moreover, the state’s interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger.[2] In the latter case, the state’s *211 interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner’s presence.[3] This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining-custody. Striking the balance required by Place, we hold that Officer Eberiy’s destruction of Immi could be found to be an unreasonable seizure within the meaning of the Fourth Amendment.
This brings us to Officer Eberiy’s qualified immunity defense. Qualified immunity absolves Officer Eberly from liability and, indeed, from the burdens of defending this suit, if he can show that a reasonable officer -with the information he possessed at the time could have believed that his conduct was lawful in light of the law that was clearly established on April 28, 1998. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In order for a right to be “clearly established,” the “contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Id. at 640, 107 S.Ct. 3034. While “[t]his is not to say that an official’s action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... it is to say that in the light of pre-existing law the unlawfulness must be apparent.” Id. (citations omitted).
As we have previously noted, the Supreme Court’s 1984 decision in United States v. Jacobsen reaffirmed the well established proposition that a Fourth Amendment seizure of property occurs whenever there is some meaningful intrusion with an individual’s possessory interest in that property and that destruction of property thus constitutes a seizure under the Fourth Amendment. Moreover, we believe that, at least after the enactment of 3 P.S. § 459-601 in 1983, a reasonable law enforcement officer in Officer Eberly’s position would have realized that a person’s dog is his personal property under Pennsylvania law. Finally, we believe that, based on Place and the cases there reviewed, a reasonable officer would have understood that it was unlawful for him to destroy a citizen’s personal property in the absence of a substantial public interest that would be served by the destruction.
If the facts asserted by the Browns are found to be true, we conclude that a reasonable officer in Officer Eberiy’s position could not have applied these well established principles to the situation before him and have concluded that he could lawfully destroy a pet who posed no imminent danger and whose owners were known, available, and desirous of assuming custody.[4] In other words, it would have been *212 apparent to a reasonable officer that shooting Tmmi would be unlawful. Accordingly, Officer Eberly has not established that he is entitled to qualified immunity.[5]
*213 B. Procedural Due Process
Under the Fourteenth Amendment, a state may not deprive a citizen of his property without affording him due process of law. U.S. Const. amend. XIV, § 1. Property interests created by state law are protected under that amendment, see Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and destruction of such property by the state constitutes a “deprivation” thereof, see Parrott v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). It follows that Officer Eberly’s destruction of Immi deprived the Browns of their property and that they were entitled to due process. See id.
Usually, the process that is constitutionally “due” must be afforded before the deprivation occurs — the state must provide predeprivation process. See Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). When the complained of conduct is “random and unauthorized” (so that state authorities cannot predict when such unsanctioned deprivations will occur), however, the “very nature of the deprivation ma[kes] prede-privation process impossible.” Id. at 137, 110 S.Ct. 975. In such situations, postde-privation process is all that is due. See id.
Contrary to the Browns’ suggestion, we conclude that no predeprivation process was constitutionally required here. In Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), a prison guard was alleged to have intentionally destroyed noncontraband personal property of an inmate while conducting an authorized “shakedown” of his cell. The inmate claimed that this constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment. The Supreme Court held that no predepri-vation process was required and that the state’s provision of a postdeprivation remedy in the form of a suit for damages provided all the process that was due. With respect to predeprivation process, the Court found that the guard’s destruc *214 tion of the property was the “random and unauthorized conduct of a state employee” and that “predeprivation procedures [were] simply ‘impracticable.’ ” Id. at 533, 104 S.Ct. 3194. The inmate, like the Browns, argued that the state’s agent (there, the guard; here, Officer Eberly) could have provided predeprivation process and was, therefore, constitutionally required to do so. Rejecting this contention, the Court observed:
Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process.
Hudson, 468 U.S. at 534, 104 S.Ct. 3194. There is no material distinction between the Browns’ case and Hudson.
Hudson is also helpful with respect to the sufficiency of the postdeprivation process provided to the Browns by Pennsylvania. At oral argument, the Browns acknowledged that Pennsylvania afforded them a judicial remedy: a civil action for conversion. Like the inmate in Hudson, however, they argue that their state remedy was inadequate because the state-employed tortfeasor was protected by sovereign immunity. This argument fails for the same reason it failed in Hudson. Pennsylvania law, like the state law in Hudson, deprives public employees of immunity for intentional torts. Section 8550 of Pennsylvania’s Political Subdivision Tort Claim Act denies immunity to any public employee when the court finds that his or her conduct constitutes, among other things, “willful misconduct.” “Willful misconduct” in this context “has the same meaning as the term ‘intentional tort.’ ” Delate v. Kolle, 667 A.2d 1218, 1221 (Pa. Commw.Ct.1995); see also Kuzel v. Krause, 658 A.2d 856, 859 (Pa.Commw.Ct.1995). Viewing the facts in the light most favorable to the Browns, they were afforded postdeprivation judicial process by the law of Pennsylvania, and such process was all that was due. Summary judgment was properly entered against the Browns on their procedural due process claim.
Because the civil rights act liability of the remaining defendants is predicated on there being a constitutional violation committed by Officer Eberly, we will hereafter confine our discussion to civil rights liability in connection with the possible Fourth Amendment violation.[6]
III. THE TOWNSHIP AND ITS SUPERVISORS
Regardless of the nature of underlying right alleged to have been aggrieved, Muhlenberg Township and its Board of Supervisors can be liable for any constitutional deprivations suffered by the Browns only if “there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.” City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 *215 (1989).[7] A direct causal link can be shown in two ways. First, “a body [such as Muhlenberg Township or its Board of Supervisors] may ... be sued directly if it is alleged to have caused a constitutional tort through ‘a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body’s officers.’ ” City of Saint Louis v. Praprotnik, 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (quoting Monell v. Dept. of Soc. Serv., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Second, the Browns could establish the requisite causal link between the constitutional deprivation and a custom, “even though such a custom has not received formal approval through the body’s official decisionmaking channels.” Monell, 436 U.S. at 690-91, 98 S.Ct. 2018. A “custom, or usage, of [a] State” for § 1983 purposes “must have the force of law by virtue of the persistent practices of state officials.” Adickes v. S.H. Kress & Co., 398 U.S. 144, 167, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In either event, the municipality’s liability can be predicated “only [upon] acts for which the municipality itself is actually responsible.... ” Praprotnik, 485 U.S. at 123, 108 S.Ct. 915. “[0]nly those municipal officials who have ‘final policymaking authority’ may by their actions subject the government to § 1983 liability.” Id. (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).
The official policy or adopted custom that subjects a municipality to § 1983 liability may relate to the training of police officers. A municipality’s failure to train its police officers can subject it to liability, however, “only where [it] reflects a ‘deliberate’ or ‘conscious’ choice by [the] municipality — a ‘policy’ as defined” in Supreme Court bases. City of Canton, 489 U.S. at 388, 109 S.Ct. 1197. Moreover, such liability arises “only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.” Id. The scope of failure to train liability is a narrow one. As the- Supreme Court has explained:
It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.
Id. at 390.
The Browns have not satisfied their burden of establishing facts sufficient to support their claim of municipal liability. They have tendered no evidence of any official policy endorsing Officer Eberly’s conduct. Indeed, the Township’s policy manual spells out a progressive use of force policy relating to animals that is inconsistent with Officer Eberly’s conduct. The policy states the “[t]he degree of force [the officer should use] is dependent upon the facts surrounding the situation the officer faces. Only a reasonable and necessary amount of force will be used.” The policy authorizes the use of chemical agents, such as oleoresin capsicum (or “pepper”) spray, “for defensive purposes.” The policy explicitly states that “[t]his weapon may also be used against attacking dogs.... ” The policy specifically ad *216 dressed the use of firearms against animals:
An officer may use a firearm to kill a dangerous animal or terminate the suffering of a critically injured or sick animal when other means of disposal are impractical. Whenever possible, the owner of the animal to be destroyed shall be contacted and written permission obtained. In the event the owner cannot be located, the identification of any available witnesses who will attest to the need to destroy the animal will be recorded by the officer. In any case, whenever the shooting of an animal is necessary, the shooting must be done cautiously to protect and [sic] nearby persons or property.
Nor have the Browns established the existence of an unconstitutional governmental custom. They argue, in essence, that Muhlenberg Township and its Board of Supervisors customarily condoned a practice of employing excessive force in handling dogs at large. The record, however, simply will not support an inference that there was a pattern of such excessive force, much less that the Board customarily condoned it.
The Browns’ evidence also falls far short of establishing their failure to train claim. To survive summary judgment on a failure to train theory, the Browns must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker’s failure to respond amounts to deliberate indifference. City of Canton, 489 U.S. at 390, 109 S.Ct. 1197. While it is true that Muhlenberg police officers received no formal training specifically directed to handling dogs, they did have the guidance of the policy manual, and we believe a reasonable trier of fact could not conclude that the need for further guidance was so obvious as to indicate deliberate indifference on the part of the Board to the Browns’ constitutional rights.
IV. POLICE CHIEFS FLANAGAN AND SMITH
The Browns also allege that Police Chief Robert Flanagan and Police Chief Harley Smith are responsible for Officer Eberly’s constitutional torts. Their argument is not that Chief Flanagan or Chief Smith directed Officer Eberly to deprive the Browns of any constitutionally protected right. Rather, the Browns focus on the alleged inadequacy of the Chiefs’ supervision.
In Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989), this court identified the elements of a supervisory liability claim. The plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling’s violation resulted from the supervisor’s failure to employ that supervisory practice or procedure. We emphasized that “it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did.” Sample, 885 F.2d at 1118. Rather, the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a “relationship between the ‘identified deficiency’ and the ‘ultimate injury.’ ” Id.
These elements have not been satisfied with respect to either Chief of Police. As to Chief Smith, the Browns have offered no explanation as to how he could be responsible for a shooting that *217 occurred almost two years after he retired. As to Chief Flanagan, the Browns have identified two supervisory practices or procedures he allegedly failed to employ. The first — -that he failed to train Muhlenberg police officers on the proper use of force against animals — must be rejected for the same reason we rejected the similar claim against the Board of Supervisors. The policy manual in effect at the time of the shooting gave instructions on how to handle situations of this kind, and a reasonable trier of fact could not conclude that the failure to provide more formal training evidenced deliberate indifference.
The Browns’ second theory is that Chief Flanagan must have been aware of Officer Eberly’s alleged practice of using excessive force against animals and nevertheless failed to take appropriate disciplinary action. There is no evidence that Chief Flanagan had knowledge of any pri- or excessive use of force on animals by Officer Eberly, however. Nor is there any evidence of a pattern of excessive use of such force by Eberly which would support a finding that Chief Flanagan should have been aware that Eberly posed a threat in situations like the one in question. While Officer Eberly acknowledged during his deposition that he had killed dogs on four prior occasions during his sixteen year career, only one of the incidents he recounted produced a complaint, and the uncontradicted evidence with respect to the others reveals nothing comparable to the Browns’ version of the facts in the case at bar. In two of these incidents, the dog charged either Eberly or a fellow officer. In the third, a stray dog had been terrorizing the neighborhood and extended, unsuccessful efforts had been made to 'catch it. The only incident that generated a complaint about excessive use of force by Officer Eberly against a dog occurred in approximately 1988, some ten years before the incident giving rise to this suit and more than eight years before Chief Flanagan assumed office on July 15, 1996.
We will affirm the District Court’s grant of summary judgment in favor of both Chief Flanagan and Chief Smith.
V. THE STATE LAW CLAIM
The Browns claim that they are entitled to recover from Officer Eberly for intentional infliction of emotional distress.[8] They emphasize that a reasonable trier of fact could conclude that Officer Eberly, without any justification whatsoever, shot Immi five times in front of her owner, deliberately ignoring the fact that the owner was screaming in protest and pleading with him not to shoot. They also point to evidence indicating that the experience of observing the slaughter of her beloved pet exacerbated Kim’s pre-existing post traumatic stress disorder, leaving her with nightmares, headaches, and severe anxiety.
In Williams v. Guzzardi, 875 F.2d 46 (3d Cir.1989), we predicted that the Supreme Court of Pennsylvania would recognize the tort of intentional infliction of emotional distress as described in Restatement (Second) of Torts § 46 (1965). We have found no Pennsylvania case since that time which alters this view. Section 46 provides in relevant part:[9]
*218 (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
Accordingly, the elements that the Browns must satisfy are (1) that Officer Eberly’s conduct was extreme and outrageous, (2) that his conduct caused a person severe emotional distress, and (3) that he acted intending to cause that person such distress or with knowledge that such distress was substantially certain to occur.[10] As we have indicated, the record would clearly support a finding that Officer Eberly intended to inflict, or knew he would inflict, severe emotional distress on Kim Brown. Moreover, Officer Eberly does not challenge the sufficiency of the evidence tendered by the Browns concerning severe emotional distress. This leaves the issue of whether the courts of Pennsylvania would permit a trier of fact to conclude that Officer Eberly’s conduct was extreme and outrageous. According to the Restatement commentary, conduct is sufficient to make out a claim for emotional distress if “the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, ‘Outrageous!’ ” Restatement (Second) of Torts § 46, cmt. d.
One Pennsylvania case has recognized an emotional distress claim in a situation like ours. In Banasczek v. Kowalski, No. 9009 of 1978, 1979 WL 489 (C.P. Luzerne County Jan. 30, 1979), the plaintiff asserted a claim for emotional distress stemming from the defendant’s shooting of two of the plaintiffs dogs. In what appears to have been a case of first impression in Pennsylvania, the court in Banasczek held that Pennsylvania recognized the tort of intentional infliction of emotional distress generally and then, following the authority of cases from Texas and Florida, concluded that “the more enlightened view is to allow recovery for emotional distress in the instance of the malicious destruction of a pet_” Id. at *2.
Officer Eberly argues in essence that the killing of a pet under any circumstances would not be recognized by the Pennsylvania courts as extreme or outrageous. We believe the Banasczek court was correct in rejecting a similar contention. Given the strength of community sentiment against at least extreme forms of animal abuse and the substantial emotional investment that pet owners frequently make in their pets, we would not expect the Supreme Court of Pennsylvania to rule out all liability predicated on the killing of a pet.
More specifically, we predict that the Pennsylvania courts would permit a trier of fact to return a verdict for the plaintiff *219 in an intentional infliction of emotional distress case where it is shown that a police officer’s attention was called to the severe emotional distress of the pet’s owner, he hesitated before shooting, and he then attempted to fire five bullets into the pet within the owner’s view and without justification. In such cases, the malicious behavior is directed to the owner as well as to the pet, with the potential for serious emotional injury to the owner being readily apparent. In the relatively few cases where similar issues have arisen in other jurisdictions, the prevailing view is consistent with the one we take. See Nelson v. Percy, 149 Vt. 168, 540 A.2d 1035, 1036 (1987); Richardson v. Fairbanks N. Star Borough, 705 P.2d 454, 456 (Alaska 1985); LaPorte v. Associated Indeps., Inc., 163 So.2d 267, 269 (Fla.1964); Katsaris v. Cook, 180 Cal.App.3d 256, 225 Cal.Rptr. 531, 538 (1986); Gill v. Brown, 107 Idaho 1137, 695 P.2d 1276, 1277-78 (Ct.App.1985); City of Garland v. White, 368 S.W.2d 12,17 (Tex.Civ.App.1963)
We find ourselves in disagreement with Officer Eberly’s reading of Daughen v. Fox, 372 Pa.Super. 405, 539 A.2d 858 (1988), and Miller v. Peraino, 426 Pa.Super. 189, 626 A.2d 637 (1993), two Pennsylvania cases involving the death of a pet in which recovery pursuant to section 46 was denied. Daughen holds that a veterinarian’s negligent operation on a family pet, without more, was not extreme and outrageous conduct for purposes of section 46.
Miller stands for the proposition that the defendant must have intentionally caused a person severe emotional distress. The vicious beating of the family dog in Miller, if proven at trial, would by all accounts have been extreme and outrageous, and we do not read the court in Miller to disagree. Rather, the Miller plaintiffs failed to allege, much less produce evidence, that the tortfeasor’s heinous acts against the dog were performed with the intention of inflicting severe emotional distress on the dog’s owners. This is not so in the case at bar, where the Browns have produced evidence from which a reasonable trier of fact could conclude that Officer Eberly shot Immi either intending to cause Kim Brown severe emotional distress or with the knowledge that the infliction of such distress on her would be virtually certain.
Officer Eberly is not entitled to sovereign immunity under state law with respect to the intentional infliction of emotional distress claim because the record will support a conclusion that he acted intentionally.[11]
VI.
The judgment of the District Court in favor of all defendants except Officer Eberly will be affirmed. The judgment in favor of Officer Eberly will be reversed, and the case will be remanded for further proceedings consistent with this opinion.

. Officer Eberly argues that an unlicensed dog under Pennsylvania law is as a matter of law an abandoned dog. We find no authority for this proposition and, accepting the evidence tendered by the Browns, are unpersuaded that Immi should be regarded as having been abandoned.

. The state’s interest in the protection of life and property undoubtedly occasioned enactment of 3 P.S. § 459-302(a) which states in relevant part:
It shall be the duty of every police officer, State dog warden, employee of the department or animal control officer to seize and detain any dog which is found running at large, either upon the public streets or highways of the Commonwealth, or upon the property of a person other than the owner of such dog, and unaccompanied by the owner. Every police officer, State dog warden, employee of the department or animal control officer may humanely kill any dog which is found running at large and is *211 deemed after due consideration by the police officer, State dog warden, employee of the department or animal control officer to constitute a threat to the public health and welfare.
While Officer Eberly relies on this statute, it would be clearly inapposite should the trier of fact credit the evidence that has been tendered by the Browns.

. See Place, 462 U.S. at 705, 103 S.Ct. 2637 (contrasting the degree of intrusion when a seizure of personal effects is made "after the owner has relinquished control of the property to a third party [and when the seizure is] from the immediate custody and control of the owner”).

. If the unlawfulness of the defendant’s conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising. As we explained in Pro v. Donatucci, 81 F.3d 1283, 1292 (3d Cir.1996) (footnote omitted):
In Bieregu v. Reno, 59 F.3d at 1459, we noted that "the absence of a previous deci *212 sion from our court on the constitutionality of the conduct at issue is not dispositive” in determining whether the particular constitutional right at issue was clearly established at a particular time, and stated that the standard "require[s] ‘some but not precise factual correspondence between relevant precedents and the conduct at issue,' ” id. (citing In re City of Philadelphia Litig., 49 F.3d at 970) in order to be satisfied. Moreover, Bieregu found law to be clearly established despite a circuit split, as long as “no gaping divide has emerged in the jurisprudence such that defendants could reasonably expect this circuit to rule” to the contrary. 59 F.3d at 1458-59. Thus, the split between the Courts of Appeals for the Fifth and the Fourth Circuits at the time of Donatucci’s actions does not preclude our deciding that Pro’s right to respond to the subpoena was clearly established.
In this case, the only court of appeals decisions addressing the relevant issue, Fuller and Lesher, had reached the conclusion that the state’s killing of a person’s dog without a public interest justification constituted a Fourth Amendment violation. That unavoidable conclusion was reached based on a common sense application of the Supreme Court precedent we have discussed.
Doe v. Delie, 257 F.3d 309 (3d Cir.2001), holds only that conflicting and materially distinguishable district court decisions did not render a right clearly established in the Third Circuit.

. There is no question but that evidence currently in the record would support findings of fact under which there would be no Fourth Amendment violation, and Officer Eberly would be entitled to qualified immunity in any event. That is not the issue before us, however. If there is evidence from which a trier of fact could conclude that a constitutional violation occurred and that a reasonable officer would have known based on clearly established law that he was violating the Browns' rights, summary judgment was inappropriate. See, e.g., Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).
Despite its protestations to the contrary, the dissent does not accept the record evidence in the light most favorable to the Browns and draw all reasonable inferences in their favor. Contrary to the assertions of the dissent, Officer Eberly’s testimony that Immi was acting aggressively before the shooting and that he did not hear Kim Brown claim ownership before he shot is not undisputed. Kim Brown's testimony would support a finding that there was no provocation for the shooting, as would the testimony of the disinterested observer in the parking lot. With respect to Officer Eberly's knowledge that the dog's owner was available and anxious to take custody, Russell Yoder, a neighbor of the Browns, gave the following testimony:
Q. And what did you hear?
A. Okay. The things that I heard — the first thing was, I heard a woman starting to shout and she was shouting, Don’t shoot, don't shoot.... I really couldn’t see anything there. But then I heard — I heard her say, That's my dog, that’s my dog, don’t shoot. So all of a sudden, right after that there were five shots that just — they just went bang, bang, bang, bang, bang, bang, and I — I got down on the — behind my door 'cause I didn't know where these shots were coming from,....
App. at 449-450.
The District Court was not free to ignore this sworn testimony given before the Civil Service Commission. It was the equivalent of an affidavit and while it technically may have been hearsay, so too are affidavits. Federal Rule of Civil Procedure 56(e) requires only that "supporting and opposing [sworn statements] be made on personal knowledge, ... set forth such facts as would be admissible in evidence, and ... show that the [declarant] is competent to testify to the matters stated therein.” The transcript of Yoder’s sworn testimony satisfies all three of these requirements. See also Williams v. Borough of West Chester Pa., 891 F.2d 458 (3d Cir.1989) (holding, on the authority of Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), that "hearsay evidence produced in a affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e., 'in a form that would be admissible at trial.’ ”) (quoting from Williams, 891 F.2d at 466, n. 6).
Moreover, ignoring Yoder’s testimony would not change the result. Kim Brown tes *213 tified that when she yelled Officer Eberly was in close proximity and hesitated in apparent response to her shout before shooting. Her testimony would clearly support a finding that Officer Eberly was on notice of the Browns’ ownership and availability before he shot. On cross examination, for example, she testified as follows:
Q. And you believe that you yelled something out?
A. Yes.
Q. But you don’t know what you yelled?
A. I believe the first thing I said was, "That’s my dog.” I’m almost positive.
Q. You say you're almost positive. Does that mean you know that you did that or you’re not sure?
A. Not one hundred percent sure.
Q. What percentage would you give to that?
A. Ninety percent.
Q. Why do you have any doubt as to what you yelled?
A. I don’t know what order I said everything in. Again, it happened so fast.
Q. How long after you yelled something did the shooting start?
A. A few seconds. I thought he hesitated. Q. What led you to believe that he hesitated?
A. There seemed to be quite a few seconds that elapsed between me seeing his arm move and seeing the actual gun.
Q. Do you know whether or not he heard you yelling?
A. I don't know what he heard.
Q. You don’t know whether he heard you yelling, right?
A. No. I don’t know what he heard.
Q. Nothing that you saw or witnessed gave you the impression one way or the other whether he heard you yell?
A. Yes. He hesitated.
Q. What do you mean by hesitated, what hesitated?
A. His arm stopped moving for a few seconds. I saw it moving, it stopped, then he brought the gun out.
App. at 106-07; App. at 108.

. At the conclusion of the argument section of the Browns' brief devoted to their procedural due process argument, they assert in conclu-sory fashion that Officer Eberly’s conduct also violated their right to substantive due process. Because of the cursory treatment of this contention, we do not regard a substantive due process issue as properly before us. We note, however, that "not all property interests worthy of procedural due process protections are protected by the concept of substantive due process.” Reich v. Beharry, 883 F.2d 239, 244 (3d Cir.1989). We know of no authority which clearly establishes that one in the Browns' position has been deprived of a property interest of the "quality” required for substantive due process protection. DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592, 600 (3d Cir.1995). Accordingly, if we were to assume a substantive due process violation, Officer Eberly would be entitled to qualified immunity on this claim.

. The requirement that liability rest on a direct causal link between the municipal policy or custom and the alleged constitutional deprivation precludes respondeat-superior liability. See Monell v. Dept. of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

. The Browns argue in their brief that Chiefs Flanagan and Smith are not entitled to sovereign immunity under Pennsylvania law. They do not indicate, however, what state tort claim against them was improperly rejected by the District Court and we cannot hypothesize one that the record would support. We thus address only the Browns' intentional infliction of emotional distress claim which is directed only towards Officer Eberly.

. Subsection (2) of Section 46 provides as follows:
*218 (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
(b) to any other person who is present at the time, if such distress results in bodily harm.
Contrary to the suggestion of the amicus, we are not persuaded that the Supreme Court of Pennsylvania would regard this subsection as having any relevance here.

. See Comment (i) to § 46 providing in relevant part:
The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.

. We agree with the District Court that Officer Eberly was entitled to summary judgment with respect to David Brown's intentional infliction of emotional distress claim. The record indicates that he did not witness the shooting and would not support a finding that Officer Eberly was even aware of his existence.