# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20653

IESHA GRANT,

Plaintiff–Appellant,

v.

CITY OF HOUSTON; KYE NAQUIN; DIANA BOCANEGRA; ANTONIO GRACIA; DAVID RUSSELL; ROBERT SIMPSON; CHASE CROMIER,

Defendants–Appellees.

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-3278

Before KING, DENNIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Appellant Iesha Grant (Grant) sued the City of Houston and six Houston Police Department (HPD) officers, alleging several claims under 42 U.S.C. § 1983. The district court granted summary judgment and, in the alternative, dismissed some of Grant's claims under Rule 12(c). We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20653

## I

In September 2010, a number of HPD officers arrived at Grant's home to execute an arrest warrant for her brother, Thomas Grant (Thomas), who had allegedly violated his probation. Upon their arrival, the officers set up a perimeter around the residence. Shortly after Officer Robert Simpson knocked on the front door, Thomas, carrying Grant's infant son, walked out onto the second-story balcony. The officers instructed Thomas to open the front door so they could speak to him. Thomas walked back inside the residence, where officers stationed on the rear perimeter observed him pour an unidentified liquid into a toilet. Thomas was apprehended without incident after exiting the residence through the rear door.

After securing Thomas and the infant in a patrol car, the officers performed a protective sweep of the residence. During the sweep, the officers discovered narcotics and a large amount of cash. Following the sweep, Grant arrived at the residence. The officers asked her permission to search the residence more thoroughly. Because Grant did not consent to a search, the officers obtained a search warrant.

After the warrant issued, Officer Steven Fisher arrived to search the residence with a narcotics detection canine. During the search, Grant's dog, Buster, who had been locked inside Grant's bathroom, began barking. Grant informed the officers that Buster had recently had a leg amputated because of an infection. To remove Buster from the immediate search area, Fisher, an experienced dog handler, led Buster downstairs and placed him in the garage.

Subsequently, Officers Simpson and Damian Garcia volunteered to search the bottom floor of the residence, which included the garage. As they entered the garage, Simpson observed a pit bull inside a kennel situated against the garage wall. He began searching certain pieces of luggage, which were stacked in the garage, for narcotics and paraphernalia. Garcia remained

2

by the door from which they had entered.  As Simpson bent down to inspect the luggage, he "heard the loud, sharp sound of aggressive barking and snarling coming from behind [him]."  Thinking that the pit bull might have escaped from its kennel, Simpson turned around and saw Buster, "a medium-sized, yellow, mixed-breed dog, with its ears folded back along the top of its head, its teeth showing, its head lowered, and standing in an aggressive stance."  As Simpson turned to face Buster, the dog charged towards the officer's legs, "snapping its teeth and turning its head sideways so that it could bite [his] leg."  Simpson kicked Buster twice, but the dog continued its aggressive approach.  After retreating to a corner, Simpson drew his pistol and fired at Buster.  Simpson's first shot caused Buster to collapse onto the floor, but the dog quickly recovered and continued to charge at Simpson.  Simpson's second shot penetrated Buster's neck, instantly killing the dog.

Simpson subsequently filed a report describing the incident, and Garcia filed a statement corroborating Simpson's account.  The Internal Affairs Division of HPD investigated and determined that the shooting was justified.  The HPD Administrative Disciplinary Committee reviewed the incident and reached the same conclusion.  An HPD crime-scene reconstruction expert, who examined the forensic evidence, concurred.  But Grant retained a veterinary expert, John Otto, DVM, who contradicted the eyewitness accounts, claiming that Buster's neck wound was "most likely an exit wound," meaning that Simpson may have shot Buster from behind.  Grant admitted that Buster had aggressive tendencies and that she heard aggressive barking from the garage prior to Simpson's discharge of his firearm.

The State of Texas brought a forfeiture action to retain the cash discovered in Grant's residence.  Several months later, Grant filed the present 42 U.S.C. § 1983 action, which she styled a counterclaim, against the City of Houston and eleven HPD officers.  The defendants removed the case to federal

No. 14-20653

court.  Grant subsequently filed an amended complaint, adding an additional officer as a defendant and alleging that the defendants violated § 1983 by illegally searching her residence, seizing her money, and killing Buster. Following discovery, the defendants filed a motion for judgment on the pleadings or in the alternative for summary judgment.  Grant entered into a settlement regarding the seizure of her money and dismissed six officers from the action, including Garcia.  She then filed a Motion to Re-align the Parties and for Leave to File Third Amended Complaint.  The magistrate judge granted the motion to realign the parties but denied Grant leave to amend her complaint.  Several weeks later, the district court granted summary judgment in favor of the defendants and, in the alternative, determined that Grant failed to plead her claims pertaining to municipal liability and the seizure of her pistol adequately.  Grant timely appealed.

## II

As an initial matter, "we must consider the basis of our own jurisdiction, sua sponte if necessary."[1]  None of the defendants were named as a party in the original forfeiture proceeding that the State of Texas filed against Grant in Texas court.  Grant asserted claims, which she styled counterclaims, against the present defendants in her answer to the State of Texas's notice of seizure and intended forfeiture.  Grant was correct to characterize these claims as counterclaims, rather than third-party claims, because there is no basis for her to assert that the counter-defendants are liable for any part of the money the State of Texas sought to seize.[2]  Under the well-pleaded complaint rule,

---

[1] *Perez v. Stephens*, 784 F.3d 276, 280 (5th Cir. 2015) (per curiam) (citing *Wilkens v. Johnson*, 238 F.3d 328, 329-30 (5th Cir. 2001)).

[2] *See Texas ex rel. Bd. of Regents of Univ. of Tex. Sys. v. Walker*, 142 F.3d 813, 816 (5th Cir. 1998); *Third-Party Complaint*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining third-party complaint as "[a] complaint filed by the defendant against a third party, alleging that

counterclaims are ordinarily insufficient to permit counter-defendants to assert federal jurisdiction.[3]   But when, as here, a defendant lodges a counterclaim that arises under federal law against a newly-joined party, that party may properly remove the case to federal court under 28 U.S.C. § 1441.[4] Accordingly, we are satisfied that we have jurisdiction to resolve this case.

### III

We review a district court's "grant of summary judgment *de novo*, applying the same standards as the district court."[5]   Summary judgment is warranted if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]

Government officials performing discretionary functions are entitled to qualified immunity against claims brought under 42 U.S.C. § 1983, meaning that "they 'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[7]   When an official

---

the third party may be liable for some or all of the damages that the plaintiff is trying to recover from the defendant" (citing FED. R. CIV. P. 14)).

[3] *See Bd. of Regents*, 142 F.3d at 816 n.2 ("The well-pleaded complaint rule bases removal jurisdiction on the existence of a claim lying within federal jurisdiction on the face of a plaintiff's well-pleaded complaint.  There has never been a suggestion that a defendant could, by asserting an artful counterclaim, render a case removable in violation of the well-pleaded complaint rule." (citing *Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998))); 14B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3722 (4th ed. 2015).

[4] *See Bd. of Regents*, 142 F.3d at 816.

[5] *Burnett Ranches, Ltd. v. United States*, 753 F.3d 143, 146 (5th Cir. 2014) (citing *Duval v. N. Assurance Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013)).

[6] FED. R. CIV. P. 56(a).

[7] *Toney v. Owens*, 779 F.3d 330, 336 (5th Cir. 2015) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (en banc)).

invokes the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defense does not apply.[8]

To overcome qualified immunity, a plaintiff must demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[9]  We have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[10]  When analyzing qualified immunity, "we 'may not resolve genuine disputes of fact in favor of the party seeking summary judgment.'"[11]

We review de novo a district court's ruling on a Rule 12(c) motion for judgment on the pleadings, applying the same standard applicable to a Rule 12(b)(6) motion to dismiss.[12]  "To avoid dismissal, a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face."[13]

We review for abuse of discretion the district court's denial of a motion for leave to amend a complaint.[14]

## IV

We first address Grant's claim that the officers used excessive force to seize Buster in violation of the Fourth Amendment.

---

[8] *Id.* (citing *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 476 (5th Cir. 2014)).

[9] *Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).

[10] *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

[11] *Id.* (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam)).

[12] *Johnson v. Teva Pharms. USA, Inc.*, 758 F.3d 605, 610 (5th Cir. 2014) (citing *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010)).

[13] *Id.* (quoting *Gentilello*, 627 F.3d at 544).

[14] *Moore v. Manns*, 732 F.3d 454, 456 (5th Cir. 2013) (per curiam) (citing *Wilson v. Bruks–Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010)).

No. 14-20653

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[15] A "seizure" of property occurs when an officer meaningfully interferes "with an individual's possessory interests in that property."[16] The destruction of property constitutes a meaningful interference with an individual's possessory interests.[17] It is beyond dispute that Simpson "seized" Buster within the meaning of the Fourth Amendment.[18]

Seizures by law-enforcement officials violate the Fourth Amendment only if they are unreasonable.[19] To determine whether a seizure was reasonable, we look to the totality of the circumstances, balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[20]

**A**

---

[15] U.S. CONST. amend. IV.

[16] *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

[17] *See Jacobsen*, 466 U.S. at 124-25 ("[T]he field test did affect respondents' possessory interests protected by the [Fourth] Amendment, since by destroying [the property] it converted what had been only a temporary deprivation of possessory interests into a permanent one.").

[18] *See San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) ("'The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment' and can constitute a cognizable claim under § 1983." (alteration in original) (quoting *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013 (9th Cir. 2002))); *see also Strickland v. Medlen*, 397 S.W.3d 184, 198 (Tex. 2013) (noting that under Texas law, dogs are personal property).

[19] *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985))).

[20] *Id.* (quoting *Graham*, 490 U.S. at 396).

No. 14-20653

Grant, relying on the Ninth Circuit's decision in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*,[21] argues that Officers Naquin, Bocanegra, Gracia, Russell, and Cromier, who were not in the garage, are responsible for Buster's death because their alleged "complete lack of preparation ensured that Simpson . . . would have NO CHOICE . . . but to use lethal force to shoot and kill Buster."

In *Hells Angels*, police officers executed simultaneous search warrants on the residences of several members of the Hells Angels and at the group's club house.[22] The officers were aware that dogs were present on several of the members' properties and "planned either to isolate or to shoot the dogs," but they had no specific plan to isolate the dogs or to use any non-lethal methods to incapacitate them.[23] During the searches, the officers shot and killed several of the members' dogs.[24] The Hells Angels sued, alleging that the officers unreasonably seized their dogs in violation of 42 U.S.C. § 1983.[25] Balancing the nature of the intrusion on the members' Fourth Amendment interests against the governmental interests at stake, the district court denied qualified immunity.[26] The Ninth Circuit upheld the district court's denial of qualified immunity, reasoning that the killing of the dogs represented a severe intrusion, and that because the officers knew that some of the members owned dogs and had ample time to prepare a non-lethal plan to subdue the dogs, the

---

[21] 402 F.3d 962 (9th Cir. 2005).

[22] *Id.* at 965.

[23] *Id.* at 968-69.

[24] *Id.*

[25] *Id.* at 965-66.

[26] *Id.* at 966.

officers' proffered governmental interests could not justify the killing of the animals.[27]

But *Hells Angels* is readily distinguishable from the instant case. Here, the officers had no advance notice that a dog was present on the premises to be searched. Moreover, Officer Fisher, an experienced dog handler, took reasonable precautions to isolate Buster while the house was being searched. Finally, while Buster's killing doubtlessly presents a grave intrusion on Grant's property rights, in this case, unlike in *Hells Angels*, the governmental interest of safety provides a sound justification.[28] The evidence in the record indicates that Simpson was genuinely surprised by Buster's presence and aggression, and Grant has marshalled only a scintilla of evidence to dispute the expert and eyewitness testimony indicating that Simpson exhausted all non-lethal options prior to using lethal force against the dog. Naquin, Bocanegra, Gracia, Russell, and Cromier could not have foreseen that Simpson would be forced to resort to such force in the course of searching the garage.

To the extent Grant contends that the foregoing officers should have intervened to prevent the shooting, her claim also fails. Only Simpson and Garcia, who is no longer party to this suit, were actually present when Buster was shot. The other officers did not participate in the shooting and could not have intervened to prevent it. Contrary to Grant's allegations of conspiracy, there is no evidence that the officers knew that Simpson would shoot Buster or placed him in a position in which shooting Buster was inevitable. Grant has failed to establish that officers Naquin, Bocanegra, Gracia, Russell, or Cromier

---

[27] *See id.* at 975-78.

[28] *See id.* at 977 ("While the governmental interest of safety might have provided a sound justification for the intrusion *had the officers been surprised by the presence of the dogs*, the same reasoning is less convincing given the undisputed fact that the officers knew about the dogs a week before they served the search warrants." (emphasis added)).

No. 14-20653

violated any of Grant's statutory or constitutional rights.  Accordingly, we hold that the district court did not err in granting summary judgment in favor of those defendants on the ground of qualified immunity.

## B

Grant alleges that by shooting Buster, Simpson violated a number of Texas statutes which, taken collectively, outline an administrative procedure for the destruction of a dog that has caused death or serious bodily injury.  But these statutes are clearly designed to provide due process for a dog owner to contest the labelling of her dog as "dangerous."[29]  Plainly, these statutes did not inhibit Simpson's right to use deadly force to protect himself from the threat of serious bodily harm.[30]  Accordingly, these provisions cannot be used as a basis to establish that Simpson's conduct was unreasonable.

Grant also contends that the district court erred in granting summary judgment in favor of Simpson on the ground that a genuine dispute exists as to the reasonableness of Simpson's use of force.  This claim also fails.  We examine an officer's use of deadly force from

> the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  We thus "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[31]

---

[29] *See, e.g.*, *In re Loban*, 243 S.W.3d 827, 830 (Tex. App.—Fort Worth 2008, no pet.) ("Section 822.0421 of the Texas Health and Safety Code authorizes an appeal from a dangerous dog declaration . . . .").

[30] *See* TEX. PENAL CODE § 9.51(a), (d) (defining the circumstances under which a peace officer may use deadly force).

[31] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (alteration in original) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

No. 14-20653

According to Simpson and Garcia, the only two eyewitnesses to the shooting, Buster backed Simpson into a corner, biting at Simpson's legs. Simpson only fired at the dog after "it was clear that the dog was aggressively trying to harm Officer Simpson." The Internal Affairs Division concluded that "[a]ll physical evidence collected is consistent with Officer Simpson's statements," and that it was reasonable for Simpson to believe "that he was imminently in danger of being bitten" by Buster at the time he discharged his weapon. A crime scene reconstruction expert for the defense observed that Buster's body was found facing the southwest corner of the garage, precisely where Simpson claimed he was standing. The expert also noted that the absence of a blood drip trail indicated that Buster died "very near the time the fatal wound was inflicted," and that Buster "appears to have been struck by a bullet fired travelling from front to back and along the underside of the dog's head and throat." The expert also opined that the location of the bullets and bullet casings supported Simpson's account. Based on this forensic evidence, he concluded that Simpson was standing "in the southwest corner of the garage when he discharged his firearm at an approaching and aggressive dog. Furthermore, the dog was not retreating or fleeing from the officer, but was in fact running towards and [sic] the officer at the time the lethal shot was fired." Finally, Grant conceded that the dog had aggressive tendencies, and that she heard Buster "aggressively barking prior to the shots being fired."

The only evidence Grant has marshaled to dispute the eyewitness accounts is Otto's statement that he suspected Buster was shot from behind. Otto based his opinion on photographs taken of the scene, which depicted blood projected in front of Buster's body. He explained that the bullet wound in Buster's neck was "most likely an exit wound" because "[a]n entrance wound would be much smaller and more circular." But Otto's interpretation of the photographic evidence is contradicted not only by the defendants' experts, but

11

also by Don Blake, a crime scene reconstruction expert whose services Grant retained.  Blake criticized HPD's expert reports on the ground that the police failed to preserve and document the scene of the shooting adequately, but he also found fault with Otto's conclusion that Buster's neck wound was an exit wound, observing that, "[i]f this is the only wound, it stands to reason it must be an entrance wound, and . . . I have seen many entrance wounds that are not circular in nature."

Grant has failed to raise a genuine dispute as to whether Buster's neck wound was an exit wound.  "[I]f the trial court concludes that the scintilla of [expert] evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to . . . grant summary judgment."[32]  By granting summary judgment on this claim, the district court implicitly determined that Otto's opinion was a mere scintilla of evidence, one insufficient to generate a genuine dispute of material fact.[33]  In light of the extensive physical and expert testimony indicating that Buster's neck wound was an entry wound, Otto's statement to the contrary is insufficient to allow a reasonable juror to conclude, by a preponderance of the evidence, that Simpson shot Buster from behind.[34]  Accordingly, we affirm the district court's grant of summary judgment in Simpson's favor.

---

[32] *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (second and third alterations in original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)); *see also id.* ("If the basis for an expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact." (citing *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 824 (5th Cir. 1993))).

[33] *See Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 485 (5th Cir. 2014) ("At best, this single [piece of evidence] amounts to a mere 'scintilla of evidence' that cannot defeat summary judgment." (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007))).

[34] *See Daubert*, 509 U.S. at 596.

No. 14-20653

## V

Grant next raises a municipal liability claim under *Monell v. Department of Social Services*[35] and *City of Canton v. Harris*,[36] arguing that the City of Houston is liable for failing to properly train its police officers to determine when force may lawfully be used against animals. The district court determined that Grant failed to plead her municipal liability claim adequately. To properly plead a municipal liability claim, "a plaintiff must allege 'that there was either an official policy or an unofficial custom, adopted by the municipality, that was the moving force behind the claimed constitutional violation.'"[37] Neither Grant's complaint nor her amended complaint "makes any mention of such a policy or custom."[38] Grant does not dispute in her briefing on appeal the district court's finding that she failed to plead a policy or custom. We agree with the district court that Grant's municipal liability claim fails on the pleadings.

## VI

Grant also alleges that the officers violated her Second Amendment right to bear arms by seizing a pistol that she lawfully owned. In reality, this claim is likely a Fourth Amendment claim that the police unlawfully seized her pistol. Regardless, Grant did not state that the pistol had been unlawfully seized, either in her complaint or in her amended complaint. Because she failed to plead sufficient facts to state a claim regarding the seizure of her pistol, the district court did not err by dismissing such claim.[39]

---

[35] 436 U.S. 658, 690 (1978).

[36] 489 U.S. 378, 388 (1989).

[37] *Thompson v. Mercer*, 762 F.3d 433, 441-42 (5th Cir. 2014) (quoting *Duvall v. Dallas Cnty.*, 631 F.3d 203, 209 (5th Cir. 2011) (per curiam)).

[38] *Id.* at 442.

[39] *Cf. id.* at 441-42.

No. 14-20653

## VII

Finally, Grant contends that the district court erred by denying her leave to file a third amended complaint. The State of Texas initiated this case when it filed a notice of seizure and intended forfeiture against Grant in September 2010. Approximately nine months later, in July 2011, Grant filed a counterclaim against the City and eleven HPD officers, in which she alleged that by seizing her money and killing Buster, the defendants violated her Fourth Amendment right to freedom from unreasonable searches and seizures.

The defendants removed the case to federal court in September 2011. In January 2012, the district court entered a scheduling order, which provided that motions for leave to amend pleadings must be filed by March 12, 2012. Grant filed her second amended third-party complaint on March 9, 2012, three days prior to the filing deadline. The defendants moved for summary judgment in September 2013. Grant did not move to amend her pleadings for a third time until May 2014—eight months after the defendants filed their motion for summary judgment and more than two years after the pleadings deadline. Her third amended complaint would have added the municipal liability and unlawful firearm seizure claims she now seeks to raise.

Although Federal Rule of Civil Procedure 15(a) normally governs the amendment of pleadings, Rule 16(b) "governs the amendment of pleadings after a scheduling order's deadline to amend has expired."[40] Rule 16(b)(4) provides that after a district court has entered a scheduling order, the "schedule may be modified only for good cause and with the judge's consent." To establish good cause, the party seeking to modify the scheduling order must show "that the deadlines cannot reasonably be met despite the diligence of the

---

[40] *Squyres v. Heico Cos.*, 782 F.3d 224, 237 (5th Cir. 2015) (quoting *Filgueira v. U.S. Bank Nat'l Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013) (unpublished) (per curiam)).

14

party needing the extension."[41]  We consider four factors when determining whether the party has shown good cause under Rule 16(b)(4): "(1) the explanation for the failure to timely [comply with the scheduling order]; (2) the importance of the [modification]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice."[42]

Grant has failed to show good cause for her delay.  She offers no evidence that she could not have reasonably raised the municipal liability and firearm seizure claims in her first or second amended complaints.  Further, she tenders no explanation to justify her inaction during the two years that elapsed between the scheduling order's deadline and her request to file a third amended complaint.

She has also failed to show that her delay did not prejudice the defendants.  The defendants filed their summary judgment motion eight months before Grant requested leave to amend.  Because the district court would have needed to consider another round of dispositive motions on Grant's newly-added claims, the defendants, to their prejudice, would have incurred additional expenses due to Grant's delay.[43]

Moreover, the district court exhibited considerable patience by granting continuances when, on several occasions, the parties asked for the court to extend various discovery deadlines.  Grant advances no explanation as to why she did not also request on those occasions a suitable extension of the deadline to modify pleadings.

---

[41] *Id.* (quoting *Filgueira*, 734 F.3d at 422).

[42] *Id.* (alterations in original) (quoting *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010)).

[43] *See Squyres*, 782 F.3d at 238-39.

No. 14-20653

While we do not discount the importance of the claims Grant sought to add in her third amended complaint, we conclude that, weighing the foregoing factors, the district court did not abuse its discretion in denying Grant leave to amend her complaint.

*     *     *

For the foregoing reasons, we AFFIRM the judgment of the district court.