# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2024

Lyle W. Cayce
Clerk

No. 22-10401
consolidated with
No. 22-11060

Rubicela Ramirez; Francisco Gonzales,

*Plaintiffs—Appellants*,

*versus*

James Killian,

*Defendant—Appellee*.

_____

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 2:18-CV-107

_____

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.
Jennifer Walker Elrod, *Circuit Judge*:

Responding to a domestic disturbance call, Deputy James Killian, without a warrant, entered the home that Rubicela Ramirez shared with her boyfriend, Francisco Gonzales. In the first minute after he entered, Killian pepper sprayed both Ramirez and Gonzales and killed two of their dogs. Ramirez and Gonzales filed this lawsuit against Killian asserting claims under 42 U.S.C. § 1983. Killian raised qualified immunity as a defense. The district court dismissed Ramirez's and Gonzales's claims for warrantless entry and

excessive force at summary judgment but permitted their claim for seizure of one of their dogs to proceed to a jury trial. The jury found Killian liable, but the district court overturned the jury verdict. As to that claim, we REVERSE the judgment as a matter of law and RENDER judgment on the verdict. As to the excessive-force claims, we REVERSE and REMAND. But as to the warrantless-entry claim, we AFFIRM.

I

On the afternoon of June 20, 2016, Deputy James Killian responded to a domestic disturbance call reporting a "big fight going on" between "Rubicela [Ramirez] and her dude" at Ramirez's and Gonzales's home in Wellington, Texas. After arriving at the home, Killian told dispatch that he heard what sounded like someone "getting beat" and stated that he was about to enter the home. Two minutes after arriving, he turned on his body camera and entered the home through the living room, shouting "Polícia!" with his gun and pepper spray drawn.

The next thirty-eight seconds of video show what happened from there. From the living room, Killian entered the kitchen, where he encountered Ramirez entering from another door. Killian ordered her to "come here, get over here, get over here and face that wall." Ramirez approached Killian. Killian then ordered: "get over there and face that g—d—n wall, b—h," simultaneously pepper spraying Ramirez's face. While this was happening, Gonzales entered the kitchen from the same door as had Ramirez. At the same time, a pit bull entered the kitchen from another door and walked up to Gonzales, wagging his tail. Killian ordered Gonzales to "get over here" and said "I'll shoot your dog." The dog—Bruno—began to walk towards Killian, and Killian shot him three times.

Killian then ordered Ramirez and Gonzales to get onto the ground and continued to pepper spray them. Neither Ramirez nor Gonzales immediately

complied, but Gonzales put his hands onto his head. Then, a German Shepherd appeared in the kitchen and walked toward Killian, who immediately shot it four times as he backed into the living room. Killian briefly exited the house from the door that he had entered and radioed for help. He then returned to the living room and continued to order Ramirez and Gonzales to get onto the ground. Ramirez and Gonzales went to their knees. Killian continued to pepper spray them. For the next few minutes, the three shouted profanities at each other as Killian unsuccessfully tried to get Ramirez and Gonzales to lie down on the ground.[1] About eleven minutes after Killian first entered the home, Ramirez and Gonzales agreed to be handcuffed and Killian seated them on a couch in the living room.

Soon thereafter, Sheriff Kent Riley arrived at the home. Upon his entry, Ramirez stood up from the couch and called out Riley's first name, asking him to help her. Killian immediately grabbed her by the hair and wrestled her to the ground. As he did so, his body camera fell off briefly and went black. Ramirez and Gonzales maintain that immediately after Killian took Ramirez to the ground, he slammed her head against the floor, though the video was still black at this point and does not show it.

Ramirez and Gonzales filed a lawsuit under 42 U.S.C. § 1983 against Killian in the Northern District of Texas.[2] Relevant to this appeal, they claimed that Killian had violated their constitutional rights by conducting an

---

[1] The video makes it disturbingly clear that the kitchen floor, onto which Killian was ordering Ramirez and Gonzales to lie down, was covered by this point in their dogs' blood.

[2] Ramirez and Gonzales also named Riley as a defendant, but all claims against Riley were dismissed at summary judgment. Ramirez and Gonzales do not appeal the dismissal of their claims against Riley.

unreasonable search and seizure and using excessive force in violation of the Fourth Amendment.

Killian moved for summary judgment, asserting qualified immunity as a defense. Killian also raised objections to several exhibits that Ramirez and Gonzales presented in their response to his summary judgment motion. The district court granted Killian's objections to all but one of the exhibits. The court also granted Killian's motion for summary judgment as to all of Ramirez's and Gonzales's claims except for the unreasonable seizure claim for Killian's shooting of Bruno.

The unreasonable-seizure claim proceeded to trial. Before beginning his case-in-chief, Killian moved for judgment as a matter of law, arguing that Ramirez and Gonzales had failed to present evidence sufficient to overcome Killian's qualified immunity defense. The district court denied the motion. The case then went to the jury, which was charged consistent with Fifth Circuit Pattern Jury Instruction 10.3. The jury found that Killian had "acted in an objectively unreasonable manner" and that "no reasonable officer could have believed that shooting the dog was lawful," awarding Ramirez and Gonzales $100,300 in compensatory and punitive damages.

Killian then filed another motion for judgment as a matter of law. This time, the district court granted the motion, finding that because "Plaintiffs still fail to identify evidence that no reasonable officer would have shot the pit bull," they had "failed to satisfy the burden they bear" to overcome Killian's qualified immunity defense. The district court denied Ramirez's and Gonzales's subsequent Rule 59(e) motion to amend the judgment.

Ramirez and Gonzales now appeal the district court's summary judgment dismissal of their warrantless-entry and excessive-force claims and its post-verdict judgment as a matter of law in favor of Killian.

## II

We review the district court's ruling on a motion for summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a defendant pleads qualified immunity as a defense, the plaintiff "must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted).

We apply the same standard of review to the district court's ruling on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law . . . ." (internal quotation marks and citation omitted)). Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a).

Although here we construe all facts in favor of Ramirez and Gonzales as the nonmoving parties, "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir.2011)); *see Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

## III

Ramirez's and Gonzales's three claims all turn on Killian's assertion of qualified immunity. Qualified immunity protects government officials from liability for damages when they violate the law, but nonetheless reasonably could have believed that they were acting lawfully. It balances two competing values: first, "the importance of a damages remedy to protect the rights of citizens"; and second, the need for officials to be free from "undue interference with their duties" and "potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806–07 (1982).

Therefore, the qualified immunity defense protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To overcome the defense, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks and citation omitted). Courts have flexibility as to the order in which they evaluate these two requirements. *Pearson v. Callahan*, 555 U.S. 223, 236, 242 (2009).

A right is "clearly established" when its "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has enunciated three ways that a constitutional right, defined with adequate particularity, can be "clearly established" for purposes of qualified immunity: (1) where it is provided by controlling authority; (2) where it is provided by "a robust 'consensus of persuasive authority,'" *al-Kidd*, 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, (1999)); and (3) where its violation is "obvious," *Hope v. Pelzer*, 536 U.S. 730, 741, 122 (2002).

Ramirez and Gonzales first argue that the district court erroneously granted Killian's motion for summary judgment as to their warrantless-entry claim. We disagree.

Although searches inside a home without a warrant are presumptively unreasonable, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted); *see also United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009) ("As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered . . . ."). Such searches must be "strictly circumscribed by the exigencies which justify [their] initiation[.]" *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968)). This is the so-called exigent-circumstances exception to the Fourth Amendment's warrant requirement. *United States v. Morales*, 171 F.3d 978, 981 (5th Cir. 1999).

Even if exigent circumstances were at one point present, there is, of course, no longer any exigency if the emergency has dissipated. For example, in *United States v. Davis*, several FBI agents retrieved a handgun from the curtilage of a home more than three hours after a police-involved shooting had taken place there. 423 F.2d 974, 976 (5th Cir. 1970). We held that this search was not reasonable because an "emergency situation cannot be relied on to justify a search occurring three and one-half hours after the emergency ended." *Id.* at 980.

Reviewing the summary judgment evidence, exigent circumstances were present when Killian first arrived at Ramirez's and Gonzales's home. He was responding to a tip from a neighbor that there was a domestic disturbance. *See United States v. Kehoe*, 893 F.3d 232, 238 (4th Cir. 2018) ("[C]ourts generally presume that a citizen-informant or a victim who

7

discloses his or her identity and basis of knowledge to the police is both reliable and credible." (citations omitted)); *cf. Reitz v. Woods*, 85 F.4th 780, 784, 791 (5th Cir. 2023) (neither party disputing that an anonymous call describing a supposed hostage situation indicated exigent circumstances). And according to his affidavit, when Killian arrived at the home, he heard the sounds of a fight that corroborated this tip.

Ramirez and Gonzales argue that Killian's affidavit was "directly contradict[ed]" by the audio and video footage from his body camera, in which there were no sounds of ongoing violence. Therefore, the district court was "required to disregard" Killian's characterization of events given this supposed contradiction. But there is no direct contradiction here. Even construing the evidence in Ramirez's and Gonzales's favor, as we must at summary judgment, it is entirely consistent with the evidence Killian produced that he may have heard a fight during the two minutes before he turned on his body camera and that such sounds had stopped by the time he did so. Nor is the fact that Killian waited for two minutes before entering the home particularly relevant. *See United States v. De Jesus-Batres*, 410 F.3d 154, 158–59 (5th Cir. 2005) (exigent circumstances even though officers did not search garage until 45 minutes after they entered the house); *United States v. Reyes-Bosque*, 596 F.3d 1017, 1030 (9th Cir. 2010) (exigent circumstances even though officers waited 15 to 20 minutes for backup before entering).

The video shows only that there were no sounds of fighting at the *instant* that Killian entered. Accordingly, Ramirez and Gonzales argue alternatively that, even if exigent circumstances were at one point present, they had dissipated. They argue that no reasonable officer could have believed that such entry was justified by exigent circumstances.

We need not reach the more difficult question, reading the evidence in the light most favorable to Ramirez and Gonzales, whether exigent

circumstances had in fact dissipated. *See Pearson*, 555 U.S. at 236, 242. That is because, regardless, the putative legal rule that Ramirez and Gonzales urge—that dissipation can occur mere minutes after the sounds of an emergency are last heard—was not clearly established at the time.

The cases that Ramirez and Gonzales cite where courts have found that exigent circumstances had dissipated are readily distinguishable. Take *Davis* for example. The search in that case occurred after a delay of three-and-a-half hours. 423 F.2d at 980. Here, there was a delay of only two minutes. In *United States v. Brown*, meanwhile, an officer returned to a room in a house to inspect a box of contraband after a sweep of the house for injured or dangerous persons had already occurred. 230 F. Supp. 3d 513, 528 (M.D. La. 2017). Here, there may well have been a person inside the house in imminent danger. Ramirez and Gonzales also cite *Hannon v. State* from the Nevada Supreme Court. Though closer to the mark, that case involved an officer who arrived—as neither party disputed—at a quiet apartment "45 minutes . . . since the argument had dissipated." 125 Nev. 142, 144, 148 (2009).

None of these opinions would have put a reasonable officer on notice that entering a home after a few minutes of silence following the sounds of a fight, which corroborated an earlier tip, violated the Fourth Amendment. Accordingly, the district court correctly held that Killian was entitled to qualified immunity on the warrantless-entry claim at summary judgment.

IV

Ramirez and Gonzales further argue that the district court erroneously granted Killian's motion for summary judgment as to their

excessive-force claim. Here, we agree with them.[3]

"To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville*, 567 F.3d at 167 (internal quotation marks and citation omitted). "The second and third elements collapse into a single objective-reasonableness inquiry." *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018). This inquiry is "fact-intensive," and turns on the following so-called *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville*, 567 F.3d at 167 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Although we review the facts in the light most favorable to Ramirez and Gonzales, we "must evaluate an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Poole*, 691 F.3d at 628 (quoting *Graham*, 490 U.S. at 396).

Ramirez and Gonzales point to two distinct uses of force: (1) Killian's use of pepper spray; and (2) his taking Ramirez to the ground and banging her head against the floor. We examine each in turn.

Killian pepper sprayed Ramirez as he told her to "get over *there* and face [the] wall," and after he had already told her to "get over *here*." Killian

---

[3] Ramirez and Gonzales also argue that the district court abused its discretion in excluding one of the pieces of evidence that they submitted at summary judgment: a report written by the Texas Rangers following an investigation into Killian's actions against Ramirez and Gonzales. Because we find the other evidence admitted at the summary judgment stage sufficient to have created a triable issue of fact, we do not reach the question of whether the district court abused its discretion in making its evidentiary rulings.

pepper sprayed Gonzales as soon as Gonzales walked into the room, while ordering him to "get over here." A reasonable jury could find that Ramirez and Gonzales were attempting to comply with Killian's orders, or that there were no consistent orders with which they could comply in the first place. Killian's subsequent uses of pepper spray occurred as he tried to get Ramirez and Gonzales—who were kneeling—to fully lie down on the ground. A jury could likewise find that Ramirez and Gonzales were partially complying during these subsequent uses of pepper spray.

Starting with the first step in the qualified immunity analysis, we conclude that, reading the evidence in the light most favorable to Ramirez and Gonzales, a genuine fact issue remains as to whether Killian's use of pepper spray constituted excessive force. The *Graham* factors weigh in Ramirez's and Gonzales's favor here. While it is true that Killian was investigating a possible assault—a serious crime, *see Poole*, 691 F.3d at 642 (Elrod, J., concurring in part and dissenting in part)—Ramirez and Gonzales were not actively resisting arrest. Killian's contention that his first orders were not contradictory, and that Ramirez and Gonzales did not comply, are flatly refuted by the video evidence. Killian's order to "come *here*" was the exact opposite of his order to "get over *there*." Nor were there any indications that either Ramirez or Gonzales posed a threat to Killian.

Having found that the summary judgment evidence would permit a reasonable jury to conclude that Killian violated Ramirez's and Gonzales's constitutional rights, we now proceed to the second step of the qualified immunity analysis. We conclude that such a violation would have been unlawful under clearly established law. An officer may not constitutionally use force on a non-threatening subject offering no resistance or merely "passive" resistance. *Ramirez v. Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013) (no qualified immunity at summary judgment where officer tased plaintiff when plaintiff pulled his arm away from officer). Put differently, an

officer may not use force against someone who has "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command." *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012); *see Bagley v. Guillen*, 90 F.4th 799, 802–03 (5th Cir. 2024).[4]

Moving now to Ramirez's and Gonzales's head-banging claim, we likewise find that they have satisfied both steps of the qualified immunity inquiry at the summary judgment stage. This is an even easier determination. Ramirez and Gonzales allege that, after Killian took Ramirez to the ground and was firmly on top of her, he slammed her head against the floor. There was summary judgment evidence that Ramirez suffered injury in the form of a black eye. And evaluating the evidence in Ramirez's and Gonzales's favor, Ramirez gave no indication that she was attempting to escape when she stood from the couch, as she was simply begging Sheriff Riley for help. Nor is it particularly plausible, especially once another officer arrived on-scene, that a handcuffed, pepper-sprayed subject could have posed much of a threat to Killian, either when she was standing or after Killian took her to the ground.

In dismissing the head-banging claim, the district court relied on cases holding that an officer's "measured and ascending" use of force in response to a plaintiff's "escalating verbal and physical resistance" is not excessive. But in those cases, the challenged use of force occurred quickly as part of a single, continuous effort to handcuff the plaintiff. *Poole*, 691 F.3d at 629 (arm

---

[4] This does not change when the force used takes the form of administering pepper spray. *See Massey v. Wharton*, 477 F. App'x 256, 257–58 (5th Cir. 2012) (unpublished) (no qualified immunity at summary judgment where officer tased and pepper sprayed plaintiff while giving plaintiff contradictory orders); *Solis v. Serrett*, 31 F.4th 975, 982 (5th Cir. 2022) ("[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonable excessive force." (quoting *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017))); *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) (unpublished).

manipulation, then a taser, then further arm manipulation); *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (unpublished) ("verbal warnings, pepper spray, hand- and arm-manipulation techniques, and then the use of a Taser"). By contrast, and as the district court acknowledged, Killian had already "gained Plaintiff Ramirez's compliance, successfully handcuffed her, [and] seated her on the living room couch" before she stood up in supposed violation of his order to stay seated. Killian's use of force here was in response to a different incident of noncompliance that occurred many minutes after he had gained Ramirez's compliance with his initial orders. It was not part of an "escalating" effort to gain compliance.

Killian, for his part, cites *Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016), for the proposition that his use of force against a handcuffed plaintiff who continued to resist arrest was not excessive. But in *Griggs*, the officer punched the plaintiff in direct response to the plaintiff's kicking the officer in the chest as the plaintiff was being loaded into a vehicle. *Id.* at 315–16. Here, Ramirez had not touched Killian at all. *Griggs* is inapposite. Again, a genuine fact issue remains as to whether Killian violated Ramirez's and Gonzales's constitutional rights.

The use of force that Ramirez and Gonzales allege that Killian engaged in here was unlawful under clearly established law. *See Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive."); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) ("[Plaintiff] was not resisting arrest or attempting to flee when [the officer] forcefully slammed her face into a nearby vehicle during her arrest . . ."). The excessive-force claims should not have been dismissed at summary judgment. They should have gone to trial.

V

Finally, Ramirez and Gonzales argue that the district court erroneously granted Killian's post-verdict motion for judgment as a matter of law on their unreasonable-seizure claim, even though the jury had found in their favor. Again, we agree.

This claim, based on Killian's shooting Bruno, was tried. The district court submitted the question of qualified immunity to the jury, tasking it with determining whether "a reasonable officer with the same information could not have believed [Killian's] actions were lawful" in light of "clearly established law." Mirroring Fifth Circuit Pattern Jury Instruction 10.3, the court instructed the jury that "[i]n this case, the clearly established law at the time was that an officer may use deadly force against a dog if the officer reasonably believes the dog poses a threat and he was in imminent danger of being attacked by the dog." In other words, the court itself gave the jury the legal rule it needed to then determine, by construing the facts in dispute, whether qualified immunity applied.

A

We must first examine the threshold question of whether the legal rule cited by the district court and given to the jury was clearly established for the purpose of qualified immunity.

At the outset, we note that neither the parties nor the district court has cited a controlling case from our circuit. They instead cite cases where we have, in unpublished opinions, addressed dog shootings by police. Two of these predate June 20, 2016, when the events at issue here transpired. *See Grant v. City of Houston*, 625 F. App'x 670 (5th Cir. 2015) (unpublished) (it was "beyond dispute" that an officer "seized" plaintiff's dog by shooting it, *id.* at 675, but such seizure was reasonable because the dog "backed [the officer] into a corner, biting at [his] legs," *id.* at 677); *Stephenson v.*

*McClelland*, 632 F. App'x 177, 184 (5th Cir. 2015) (unpublished) ("This court has held that the killing of a dog can constitute a seizure within the meaning of the Fourth Amendment . . . . [which] requires that a seizure be objectively reasonable.").

Nevertheless, while these cases all announce the relevant legal rule, our unpublished opinions cannot themselves establish binding law for this circuit. *See Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019). While they can still serve as "persuasive authority,"[5] *Ramirez v. Guadarrama*, 3 F.4th 129, 135 (5th Cir. 2021), we must look elsewhere to determine whether the legal rule given to the jury was clearly established.

"[I]n the absence of directly controlling authority, a consensus of cases of persuasive authority might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful." *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) (internal quotation marks omitted); *see also Wilson*, 526 U.S. at 617; *al-Kidd*, 563 U.S. at 742; *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014); *Jimerson v. Lewis*, 94 F.4th 423, 429 (5th Cir. 2024); *Morrow v. Meachum*, 917 F.3d 870, 879 (5th Cir. 2019). Where no directly controlling authority applies, "we look to the law of other jurisdictions 'in assessing whether a

---

[5] Multiple district courts within our circuit have likewise applied the legal rule that we articulated in those unpublished opinions. *E.g.*, *Romero v. Bexar County*, 993 F. Supp. 2d 658, 661 n.3 (W.D. Tex. 2014) ("Circuit courts routinely find that the killing of an individual's pet can constitute a seizure within the meaning of the Fourth Amendment."); *Kincheloe v. Caudle*, No. A-09-CA-010 LY, 2009 WL 3381047, at *8 (W.D. Tex. Oct. 16, 2009), *report and recommendation adopted*, No. A-09-CA-010-LY, 2009 WL 10699745 (W.D. Tex. Dec. 7, 2009) (holding plaintiffs "alleged a violation of a clearly established constitutional right," *id.* at *6, and denying summary judgment on qualified immunity because "[b]ased upon Plaintiffs' allegations . . . [the dog] did not pose an immediate danger to the public or [the officer]," *id.* at *8).

reasonable [official] would have known . . . that his conduct was unlawful.'" *Morgan v. Swanson*, 659 F.3d 359, 372 n.26 (5th Cir. 2011) (en banc) (Benavides, J.) (quoting *McClendon*, 305 F.3d at 329); *see also id.* at 412–13 (Elrod, J.) ("We need only consider other circuits 'in the absence of directly controlling authority.'" (quoting *McClendon*, 305 F.3d at 329)); *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022) ("When there is no direct controlling authority, 'this [C]ourt may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority.'" (alteration in original) (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018))).

Looking, therefore, to the other circuits, we find a robust consensus that an officer may not, consistent with the Fourth Amendment, kill a pet dog unless he reasonably believes that the dog poses a threat and that he is in imminent danger of being attacked. We are far from the first to recognize and apply this rule—in fact, we are almost the last.

Each of our sister circuits save for the Eleventh Circuit has addressed, in published opinions, the applicability of the Fourth Amendment to state officials' killing pet dogs.[6] Eight of those opinions were published before June 20, 2016. The legal rule that they announce is clear: killing a pet dog constitutes a seizure of property under the Fourth Amendment, which must then be evaluated for reasonableness to determine whether the killing ran afoul of the Constitution. *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009); *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013); *Brown v. Muhlenberg Township*, 269 F.3d 205, 210–11 (3d Cir. 2001); *Altman v. City of High Point*, 330 F.3d 194, 205 (4th Cir. 2003); *Brown v. Battle Creek Police*

---

[6] *Stafford v. City of Argo*, 514 F. Supp. 3d 1353, 1363 (N.D. Ala. 2021) ("[T]he Eleventh Circuit is not among the circuit courts that have addressed the issue. . . .").

*Dep't*, 844 F.3d 556, 567 (6th Cir. 2016); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994); *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008); *Robinson v. Pezzat*, 818 F.3d 1, 7 (D.C. Cir. 2016); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977–78 (9th Cir. 2005); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano County*, 278 F. 3d 1007 (9th Cir. 2002); *Mayfield v. Bethards*, 826 F.3d 1252, 1259 (10th Cir. 2016). "No circuit court has held otherwise." *Maldonado*, 568 F.3d at 271; *see Stafford*, 514 F. Supp. 3d at 1362–63 (collecting cases).

Where the killing is done by a police officer while on-duty, the Fourth Amendment analysis centers on whether the pet dog posed an immediate danger and whether killing it was unavoidable. *See, e.g.*, *Robinson*, 818 F.3d at 7 ("[D]eadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."); *Carroll*, 712 F.3d at 651 ("[A]t least in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community."); *Brown v. Muhlenberg Township*, 269 F.3d at 210–11 ("[An officer cannot] lawfully destroy a pet who posed no imminent danger and whose owners were known, available, and desirous of assuming custody."); *Battle Creek*, 844 F.3d at 568 (the question is whether the dogs "posed imminent threats to the officers."); *Viilo*, 547 F.3d at 710 ("[T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."); *San Jose Charter of Hells Angels*, 402 F.3d at 977–78 ("[T]he Fourth Amendment forbids the killing of a person's dog, or the destruction of a person's property, when that destruction is unnecessary.")

The "factual context" in the several of these cases is very "similar to that of the instant case." *See McClendon*, 305 F.3d at 332. In at least four, the court held *against* defendant officers' assertions of qualified immunity for shooting pet dogs on or adjacent to their owners' property because those dogs

17

either were nonaggressive or could have been dealt with through nonlethal means. *Robinson*, 818 F.3d at 4–5, 13 (reversing grant of qualified immunity in favor of officer who, during the execution of a search warrant, opened a bathroom door and shot a dog that was secured inside); *Brown v. Muhlenberg Township*, 269 F.3d at 209, 219 (reversing grant of qualified immunity in favor of officer who shot nonaggressive dog in parking lot next to owner's house and against the owner's protestations); *Viilo*, 547 F.3d at 712 (dismissing appeal from denial of qualified immunity against officers who shot dog that emerged from behind owner's house and approached officers); *San Jose Charter of Hells Angels*, 402 F.3d at 977–78 (affirming denial of qualified immunity against officers who executed search warrant knowing dogs were present but formed no alternative plan and intended instead to kill them).

On the other hand, where courts have held in the defendant officers' favor, pet dogs were displaying signs of aggression such that the officers reasonably feared for their safety. *Carroll*, 712 F.3d at 650 (dog was "growling, barking, and quickly and aggressively approaching" officers); *Altman*, 330 F.3d at 206 (officers were "confronted" by dogs that had already attacked them and other persons in the neighborhood, and by a dog that had behaved aggressively); *Battle Creek*, 844 F.3d at 562 ("[D]ogs [were] barking aggressively, 'digging and pawing,' and 'jumping' at the window.").

In light of the clear delineation that these cases draw between constitutionally permissible and impermissible officer conduct in factually similar circumstances, the potential unlawfulness of Killian's shooting of Bruno was "'apparent' in light of pre-existing law." *McClendon*, 305 F.3d at 332 (quoting *Anderson*, 483 U.S. at 640).

We acknowledge that it is difficult for persuasive authority, rather than controlling authority, to clearly establish a legal rule. *See id.* at 331–32 (finding no consensus on the "state-created-danger theory" where circuits

disagreed over, *inter alia*, the requisite mental state to impose liability on state actors, and where "no court" had applied the theory "to a factual context similar to that of the instant case."). But if ever a robust consensus of persuasive authority existed, it exists here.[7] Crucially, there is no disagreement that we can discern over the contours of this legal rule. Almost every other circuit applies it. District courts in our circuit regularly apply it. And we ourselves have applied it, simply choosing not to publish the opinions that did so. *Jones v. Lopez*, 689 F. App'x 337 (5th Cir. 2017) (unpublished); *Grant*, 625 F. App'x at 675, 677; *Stephenson*, 632 F. App'x at 184. It should come as no surprise to an officer that he may not go around shooting citizens' nonaggressive dogs. Indeed, it is a matter of "common sense." *Viilo*, 547 F.3d at 710.

Therefore, "consistent with [] every other circuit court to have addressed the issue," we recognize that the "killing of a pet dog can be a seizure." *Jones*, 689 F. App'x at 339; see also *Robinson*, 818 F.3d at 7 (collecting cases). Such a seizure is reasonable only if the dog "poses an immediate danger and the use of force in unavoidable." *Viilo*, 547 F.3d at 710; *Robinson*, 818 F.3d at 7. This law was clearly established when Killian entered Ramirez's and Gonzales's home and killed their dogs.

## B

Having already been given the applicable law, the jury had ample evidence before it to find that qualified immunity did not apply. The jury,

---

[7] We are not even the first court to hold that a robust consensus of persuasive authority clearly establishes *this exact legal proposition*. The First Circuit in *Maldonado* "reject[ed]" the defendant state official's argument that the "law was not clearly established because *this* court had not earlier addressed" whether killing a pet dog could constitute an unreasonable seizure. 568 F.3d at 271. Rather, because four other circuits had already held as much, "the law was sufficiently recognized by courts to be clearly established." *Id.*

properly instructed, found Killian liable for violating Ramirez's and Gonzales's constitutional rights and awarded them damages. Our own review of the body camera video gives us no reason to disagree. Here, Bruno had displayed no signs of aggression prior to approaching Killian. Mere seconds before Killian opened fire, Bruno had walked up to Gonzales wagging his tail.

However, throughout trial, the district court had demanded that Ramirez and Gonzales produce "reasonable officer evidence." Despite allowing the question to go to the jury, the court subsequently granted Killian's post-verdict motion for judgment as a matter of law because Ramirez and Gonzales "*still* faile[d] to identify evidence indicating that no reasonable officer could have believed shooting the Plaintiffs' pit bull to be lawful."

This reasoning was erroneous. Although the qualified immunity defense is often decided long before trial, "if . . . there remain *disputed issues of material fact* relative to immunity, the jury, properly instructed, may decide the question." *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (internal citation and quotation marks omitted) (emphasis added). The jury decides the *factual* question of whether the officer violated the plaintiff's rights—the first step of the qualified immunity analysis. It does not decide the purely *legal* question of whether the officer's actions were objectively reasonable in light of clearly established law—the second step. *See Brown v. Callahan*, 623 F.3d at 253 ("Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury."); *see also Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999); *Mangieri v. Clifton*, 29 F.3d 1012, 1014 (5th Cir. 1994).

There is therefore no requirement that plaintiffs present "evidence" to overcome the second prong of qualified immunity, or specifically produce

officer testimony as to what a reasonable officer would regard as lawful.[8] To the extent that the district court was evoking some form of "three-step" qualified immunity framework, it was likewise incorrect. *See Hicks v. LeBlanc*, 81 F.4th 497, 503 n.14 (5th Cir. 2023) ("[T]here is no 'standalone "objective reasonableness" element to the Supreme Court's two-pronged test for qualified immunity.'" (quoting *Baker v. Coburn*, 68 F.4th 240, 251 n.10 (5th Cir. 2023), *as revised* (May 19, 2023)); *Trent v. Wade*, 776 F.3d 368, 384 (5th Cir. 2015).

Nor would the district court's requirement make much sense as a logical matter. In denying a motion for summary judgment on qualified immunity grounds, as happened here, "the trial court makes two determinations. First, it decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Brothers v. Zoss*, 837 F.3d 513, 517 (5th Cir. 2016) (internal citation and quotation marks omitted). In other words, when a plaintiff's claim survives the defendant's qualified immunity defense at summary judgment and proceeds to trial, there has already been, necessarily, a judicial determination as to the second qualified immunity step. In this situation the trial court has held that, assuming that the plaintiff's version of the facts is true, the defendant would not be entitled to qualified immunity. The question at trial is then solely one of fact. The jury requires no additional "reasonable officer evidence" to deny qualified immunity.

---

[8] *McCoy v. Hernandez*, which the parties brief in some detail, does not impose such a requirement. 203 F.3d 371 (5th Cir. 2000). In that case we held only that a jury could properly decide whether qualified immunity applies, not what evidence it would require to be able to do so. *Id.* at 376 (citing *Snyder*, 142 F.3d at 799).

The unreasonable-seizure claim made it to the jury. The jury delivered a verdict in favor of Ramirez and Gonzales. That should have ended the matter.

\*　　\*　　\*

Accordingly, while we AFFIRM the summary judgment on the warrantless-entry claim, we REVERSE the summary judgment on the excessive-force claims and REMAND those claims for further proceedings consistent with this opinion. We REVERSE the judgment as a matter of law on the unreasonable-seizure claim and RENDER judgment on the verdict.