# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 12, 2024

Lyle W. Cayce
Clerk

———————

No. 23-30879

———————

WESLEY PIGOTT, *on his own behalf* and *on behalf of his minor child* K.P.; MYA PIGOTT,

*Plaintiffs—Appellants*,

*versus*

PAUL GINTZ, SHIELD NO. 91581,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:21-CV-1015

———————————————————

Before WILSON, DOUGLAS, *Circuit Judges*, and VITTER, *District Judge*.[*]

PER CURIAM:[†]

Wesley Pigott and his children, Mya and K.P., challenge the district court's grant of summary judgment in favor of Deputy Paul Gintz on qualified immunity grounds. After observing Mr. Pigott drive his Ford F-250 briefly through the parking lot of the Rapides Parish Detention Center

———————————————

[*] United States District Judge for the Eastern District of Louisiana, sitting by designation.

[†] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

("RPDC"), Deputy Gintz followed the Pigotts in his personal vehicle for roughly ten minutes before they voluntarily stopped in a parking lot. Much of the following interaction between the Pigotts and Deputy Gintz was not captured on video, although there is footage available after a second deputy arrived minutes later. The parties offer competing versions of what transpired off camera. The Pigotts allege that an inebriated Deputy Gintz created an extremely tense and dangerous situation by pointing his firearm directly at Mr. Pigott and the children while yelling threatening language. Deputy Gintz contends that he drew his firearm only after Mr. Pigott failed to comply with several commands and that he had the gun in the "low ready" position throughout the encounter. The Pigotts filed suit pursuant to 42 U.S.C. § 1983, alleging that Deputy Gintz violated their Fourth and Fourteenth Amendment rights by utilizing excessive force and conducting an unreasonable seizure. The district court granted Deputy Gintz qualified immunity at summary judgment. For the following reasons, we REVERSE IN PART and AFFIRM IN PART.

## I.

Wesley Pigott is the father of K.P. and Mya Pigott. Mr. Pigott and his seventeen-year-old daughter Mya both worked at the Huddle House restaurant in Alexandria, Louisiana. At Huddle House, Mr. Pigott supervised individuals detained at the RPDC who participated in a work-release program. On the evening of April 17, 2020, Mr. Pigott and Mya picked up K.P. and two of his friends from fishing, after which Mya asked her father to see where the work-release individuals Mr. Pigott supervised lived. In response, Mr. Pigott drove by the RPDC, briefly entered the parking lot, and then drove off.

Mya testified that she saw Deputy Gintz sitting in a chair outside the RPDC as her father drove through the parking lot, although Deputy Gintz

contends that he was working inside the facility and was sitting at a desk. Deputy Gintz, the supervisor on duty that day, testified that two deputies who were inside the fence of the RPDC saw a truck drive slowly through the parking lot and radioed it in. According to Deputy Gintz, those deputies saw one person in the back of the truck. Deputy Gintz testified that he had concerns that the driver of the truck may have introduced contraband into the jail or possibly aided in the escape of a detainee. But Deputy Gintz conceded that neither he nor any other deputy at the RPDC saw the occupants of the truck throw anything from the vehicle or commit any other illegal act. Deputy Gintz did not observe the truck drive near the fences surrounding the RPDC where contraband could have been introduced, and he testified that the truck did not speed or drive erratically through the parking lot.

After receiving the radio call about the truck, Deputy Gintz maintains that he left his desk and walked outside, at which point he observed three persons in the vehicle. Deputy Gintz then proceeded to get into his personal vehicle to pursue the Pigotts' truck. Deputy Gintz allegedly used his personal vehicle because he did not have time to go back inside to get the keys to a marked unit, even though this admittedly violated department policy and procedure.

Shortly after the Pigotts exited the RPDC parking lot, Mya told her father that someone was following them. Mr. Pigott proceeded back to Highway 28, turned left to travel back to town, and changed lanes a few times to confirm he was being followed. While both vehicles were stopped at a red light, Deputy Gintz observed that the persons in the bed of the truck were three minors.

Mr. Pigott eventually decided to pull over to determine why someone was following him, as he did not want to be followed to his house. Before he

stopped his truck, Mr. Pigott drove the wrong way down a frontage road to see whether his pursuer would follow.  Deputy Gintz followed, after which Mr. Pigott voluntarily stopped his truck in a nearby parking lot.  Deputy Gintz pulled into the same lot, parking his vehicle directly behind Mr. Pigott's truck.  Deputy Gintz had followed the Pigotts for approximately ten minutes, or seven to eight miles.

What happened next is the subject of the Pigotts' § 1983 suit and is disputed by the parties.  No video evidence exists to corroborate or undermine either party's version of events because Deputy Gintz was not wearing a body-worn camera.  The Pigotts contend that, immediately after exiting his personal vehicle, Deputy Gintz pointed his gun at Mr. Pigott, who was standing on the driver side step bar of his truck.  According to Mr. Pigott's and K.P.'s deposition testimonies, Deputy Gintz commanded Mr. Pigott to "get the fuck out of the truck" and to put his hands up, and Mr. Pigott promptly obeyed.[1]  The Pigotts assert that Deputy Gintz then pointed his gun at Mya who was sitting in the front passenger seat, and at the three boys in the bed of the truck, instructing them to put their hands up, which they did.

Conversely, Deputy Gintz testified he only drew his firearm after Mr. Pigott, who was leaning into his truck with his back towards Deputy Gintz, failed to comply with several commands to show his hands.  Deputy Gintz also denies having ever pointed his gun at the children.  Deputy Gintz did, however, testify that neither Mr. Pigott nor the children were doing anything threatening when he approached the Pigotts' vehicle, and that the children were "just sitting there quiet."  Deputy Gintz also stated that Mr. Pigott stopped his vehicle voluntarily and that he never attempted to flee.

-----

[1] Mya likewise testified that Deputy Gintz ordered her father to "[g]et out of the car," after which Mr. Pigott got out of the car.

During the encounter, Deputy Gintz never identified himself as law enforcement. Mya testified that she feared that they were being robbed. Mr. Pigott did not see the badge on Deputy Gintz's person or recognize him as law enforcement until after Deputy Gintz had already drawn his gun and pointed it at Mr. Pigott. The children could not make out how Deputy Gintz was dressed or whether he was wearing a uniform because the headlights of Deputy Gintz's personal vehicle were shining in their faces.

The Pigotts assert that after they complied with Deputy Gintz's initial commands to put their hands up, Deputy Gintz moved closer and pointed his gun close to Mr. Pigott's forehead, between his eyes. Mr. Pigott reportedly remained calm and collected throughout the encounter and repeatedly told Deputy Gintz to "stay calm" as well. Deputy Gintz then instructed Mr. Pigott to turn around to face his vehicle, and Mr. Pigott complied. Deputy Gintz then asked Mr. Pigott a series of questions while allegedly pointing his gun at the back of Mr. Pigott's head. According to the Pigotts, Deputy Gintz pressed the barrel of the gun against the back of Mr. Pigott's head. Mya and K.P. both testified that they saw Deputy Gintz's finger on the trigger. At one point during the encounter, Mr. Pigott allegedly tried to turn to face Deputy Gintz while answering one of his questions, prompting Deputy Gintz to yell out, "[i]f you turn around again, I'm going to blow your fucking head off."

Mr. Pigott testified that he smelled alcohol on Deputy Gintz's breath because he was so close to him, but Deputy Gintz denies drinking alcohol at work or on the day of the incident. Deputy Gintz also denies ever pointing the gun between Mr. Pigott's eyes, pressing it against the back of Mr. Pigott's head, or threatening to shoot Mr. Pigott in the head. Deputy Gintz maintains that although he had his firearm drawn, he had it pointing at the ground in a "low gun ready position" throughout the encounter.

No. 23-30879

Mr. Pigott's minor child, K.P., stated that he feared for his own life and the lives of his friends who were with him.[2]  The children were crying. K.P. testified that he repeatedly begged Deputy Gintz not to shoot his father. The children heard and saw every action Deputy Gintz took, except for K.P.'s eleven-year-old friend, who cowered in fear in the bed of the truck.

Deputy Gintz continued to question Mr. Pigott for a total of about three minutes until a second deputy, Clayton Lacaze, arrived.  Deputy Lacaze wore a body camera, and the events that followed his arrival are captured on video.  When Deputy Lacaze first stepped out of his vehicle, Mr. Pigott can be seen standing facing his truck with his back towards Deputy Gintz and his hands above his head.  Mya is seen in the front passenger seat with her hands raised above her head, and the three boys are seen in the bed of the truck sitting quietly.  K.P. testified that when Deputy Lacaze arrived and stepped out of his car, Deputy Gintz still had his gun to his father's head.  Deputy Lacaze testified he observed Deputy Gintz holding the gun at a low ready position, which he described as having the weapon unholstered and "ready" but "not pointed at anyone" such that it is "just kind of pointed down toward the ground area."[3]  Deputy Gintz agrees with Deputy Lacaze's depiction. However, the footage from Deputy Lacaze's body-worn camera contradicts both K.P.'s and the deputies' accounts.  The video shows Deputy Gintz standing several feet behind Mr. Pigott with his left hand outstretched towards Mr. Pigott's back and his right hand holding his firearm, which was raised up to his chest and pointed directly at Mr. Pigott's back at a slight downward angle.  At this time, the gun was not pressed against Mr. Pigott's

_____

[2] At the time of the incident, K.P. was fifteen years old, and his two friends were about eleven and thirteen or fourteen years old.

[3] Deputy Gintz similarly characterized the "low ready position" as having "the weapon drawn and ready" but pointed "down at the ground" and not directly at anyone.

head, and the barrel appears to have been about two to three feet away from his body.

Deputy Lacaze testified that he did not know why Deputy Gintz had been following Mr. Pigott in his personal vehicle. Deputy Lacaze did not draw his weapon, and he stated that Mr. Pigott and his children were not doing anything threatening when he arrived. Deputy Lacaze conducted a pat-down search of Mr. Pigott and told Mya that she could lower her hands. Deputy Gintz is then seen holstering his firearm. Deputy Lacaze requested to see Mr. Pigott's driver's license, and Mr. Pigott complied. Mr. Pigott also offered to allow the officers to search his vehicle, and Deputy Lacaze conducted a cursory search but saw nothing suspicious. Deputy Lacaze explained to Mr. Pigott that they had previously had problems at the RPDC with people driving by and throwing contraband over the fence. At the end of the encounter, Deputy Lacaze told Mr. Pigott that they had no reason to believe he was involved in any attempt to introduce illegal contraband into the RPDC and told Mr. Pigott that he was free to leave. Deputy Lacaze testified that Mr. Pigott had not been free to leave before this point.

As a result of this incident, the Internal Affairs Division of the Rapides Parish Sheriff's Office investigated Deputy Gintz's actions. A report prepared from the investigation found that Deputy Gintz had abandoned his post as a supervisor, pursued a truck in his personal vehicle counter to department policy, and improperly drawn his weapon and pointed it at Mr. Pigott. The investigation pointed to Deputy Gintz's own report that no deputy had observed Mr. Pigott or anyone in the vehicle commit any illegal act while on the premises of the RPDC. The investigation report states that the Ford "F-250 was only observed exiting the parking lot at a suspicious time of day," and that Deputy Gintz "did not have enough justification to use his [personal vehicle] to follow the F-250 . . . and use a show of force with his firearm to gain compliance of the driver." The report then concluded

that Deputy Gintz "showed poor judgment and decision making by leaving the facility without a supervisor, using his [personal vehicle] to follow another vehicle off the premises and using an improper show of force with his firearm."

Mr. Pigott testified that, as a result of the incident, he developed paranoia around law enforcement, and his children became afraid to sleep alone and would not go outside without their father. Mya began having nightmares and could not sleep alone for a year, and the family got her a service dog to help. K.P. previously wanted to be a game warden, but the incident with Deputy Gintz allegedly eroded his trust in law enforcement. Mr. Pigott testified that K.P. suffered "such severe mental anguish that his personality and behavior [had] drastically changed"; he was "a happy, laid-back child and straight-A student who had never been in trouble before"; and "[s]ince April 17, 2020, K.P. has become depressed and angry, his grades have plummeted, and he's gotten into trouble outside the home." Eventually, due partially to the fear and anxiety created by the incident, the family moved out of state.

On April 16, 2021, the Pigotts brought this action under 42 U.S.C. § 1983, asserting claims of, *inter alia*, unreasonable seizure and excessive force under the Fourth and Fourteenth Amendments, as well as state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, assault, and battery. Deputy Gintz moved for summary judgment based on qualified immunity, and the district court granted the motion. The district court found that the seizure was reasonable, that Deputy Gintz did not use excessive force in violation of clearly established law, and that the Pigotts failed to show more than a *de minimis* injury. The district court also declined to exercise supplemental jurisdiction over the Pigotts' state law claims. This appeal timely followed.

No. 23-30879

## II.

We review de novo a district court's resolution of legal issues at summary judgment on the basis of qualified immunity. *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could "affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In reviewing an appeal from summary judgment, we 'view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *Hanks*, 853 F.3d at 743 (quoting *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016)).

## III.

The doctrine of qualified immunity shields public officials from suit and liability under § 1983, "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *accord Crane v. City of Arlington*, 50 F.4th 453, 463 (5th Cir. 2022); *see also Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986) ("[Q]ualified immunity is an immunity from suit, and extends beyond just a defense to liability to include all aspects of civil litigation."). This legal doctrine "attempts to balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson*, 555 U.S. at 231).

9

The court evaluates claims of qualified immunity at summary judgment using a two-pronged inquiry, which may be considered in either order. *Pearson*, 555 U.S. at 236. The first prong "asks whether the facts, 'taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right.'" *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (cleaned up). The second prong of the analysis "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

When a defendant pleads qualified immunity as a defense, the plaintiff must rebut the defense by raising a "'genuine issue of material fact suggesting [the defendant's] conduct violated an actual constitutional right,' and [the defendant's] actions were 'objectively unreasonable in light of clearly established law at the time of the conduct in question.'" *Bagley v. Guillen*, 90 F.4th 799, 802 (5th Cir. 2024) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). Here, the Pigotts bear the burden of putting forth "summary judgment evidence" demonstrating why immunity is inapplicable. *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (citation omitted); *see also Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) ("[A] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." (quoting *Ratliff v. Aransas County*, 948 F.3d 281, 287 (5th Cir. 2020))).

## A.

The Pigotts first argue that the district court erroneously granted Deputy Gintz's motion for summary judgment as to their excessive force claim. We agree.

We begin with the axiom that "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (internal quotation marks omitted)) (cleaned up). "'In qualified immunity cases,' which often involve competing versions of events, we take 'the plaintiff's version of the facts,' unless that version 'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Joseph*, 981 F.3d at 325 (quoting *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007)). When the record includes video evidence, the court is not bound to view the facts in the light most favorable to the nonmovant if those facts are "clearly contradict[ed]" or "utterly discredited" by the videotape. *Scott*, 550 U.S. at 378–80; *see also Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018) ("[A] court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account."); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

The events prior to Deputy Lacaze's arrival were not captured on video. And the Pigotts' version of what transpired during this time differs significantly from Deputy Gintz's version. Because there is no video or other evidence in the record that blatantly contradicts the Pigotts' account, we must view the facts and draw reasonable inferences in their favor. *See Scott*, 550 U.S. at 378. As for what transpired after Deputy Lacaze's arrival, which was captured on his body-worn camera, we will not discount the Pigotts' version of the facts insofar as it is not clearly contradicted by the video footage. *See id.* at 378–80; *Darden*, 880 F.3d at 730. With these evidentiary principles in mind, and viewing the facts in the light most favorable to the Pigotts, we conclude that the Pigotts have offered summary judgment

evidence sufficient to create a genuine dispute of material fact as to whether Deputy Gintz's conduct (1) violated their rights to be free from excessive force and (2) was objectively unreasonable in light of clearly established law.

1.

Regarding the first prong of our qualified immunity analysis, the constitutional provision governing the claims against Deputy Gintz is the Fourth Amendment, which protects the right to be free from excessive force during a seizure. "A violation of this right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph*, 981 F.3d at 332 (citing *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)). Determining whether Deputy Gintz's use of force was clearly excessive or unreasonable is a "'necessarily fact-intensive' and case-specific inquiry," *id.* (quoting *Poole*, 691 F.3d at 628), that demands a careful "balancing of 'the nature and quality of the intrusion on the [Pigotts'] Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tolan*, 572 U.S. at 656 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). This inquiry is an objective one and requires the court to consider the totality of the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). The "reasonableness" standard, although incapable "of precise definition or mechanical application," is ordinarily informed by three nonexclusive factors announced by the Supreme Court in *Graham v. Connor*: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Joseph*, 981 F.3d at 332 (quoting *Graham*, 490 U.S. at 396 (internal quotation marks omitted)).

On balance, the three *Graham* factors weigh in favor of the Pigotts. Despite Deputy Gintz's apparent concerns that the Pigotts may have introduced or attempted to introduce contraband when they pulled into the RPDC parking lot, he concedes that neither he nor any other RPDC personnel saw anyone in the truck throw contraband, drive near the fences where contraband could have been introduced, or engage in illegal activity. That there reportedly had been recent attempts by others to introduce illegal contraband into the RPDC, without more, was not enough to give Deputy Gintz reasonable suspicion to stop the Pigotts' vehicle. *See Hankins v. Wheeler*, 109 F.4th 839, 846–47, 52 (5th Cir. 2024) (noting that recent criminal activity in a specific location, without a particular connection between the crime suspected in that area and the individual stopped, does not give an officer reasonable suspicion for a stop and, thus, weighs against the officer for the crime-severity *Graham* factor). Indeed, Gintz concedes that the basis for the stop was the Pigotts' driving the wrong way down a one-way road—a minor traffic offense. *See Hanks*, 853 F.3d at 745 (holding that the first *Graham* factor weighed against the officer when plaintiff was stopped for a "minor traffic violation" for driving twenty miles per hour below the speed limit); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("[The plaintiff] was stopped for a minor traffic violation[,] . . . making the need for force substantially lower than if she had been suspected of a serious crime.").

As to the second *Graham* factor, we assess whether the Pigotts posed "an immediate threat" to the safety of Deputy Gintz at the time he resorted to the use of force. *Graham*, 490 U.S. at 396. However, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009); *see also Tucker v. City of Shreveport*, 998 F.3d 165, 181–82 (5th Cir. 2021) ("[A] use of force that may begin as reasonably necessary in order to obtain compliance may cease to be so as a suspect

13

becomes more compliant."); *Joseph*, 981 F.3d at 335 ("Force must be reduced once a suspect has been subdued."). In other words, because force must be proportionate to the perceived threat, the continued use of force becomes unreasonable when any such threat ceases to exist. *See Tucker*, 998 F.3d at 181–82; *Lytle*, 560 F.3d at 413.

Assuming, without deciding, that Deputy Gintz was objectively reasonable when he initially brandished his firearm while approaching the Pigotts' vehicle, and viewing the evidence in the light most favorable to the Pigotts, any perceived threat to Deputy Gintz's own safety could have been quickly dispelled soon after the encounter began. At some point after approaching the Pigotts' vehicle, Deputy Gintz could see the vehicle's occupants, including the four minors. Because the RPDC houses only adults, he could readily determine that these children were not escapees. Again, crediting the Pigotts' version of the facts at summary judgment, *see Scott*, 550 U.S. at 378, Deputy Gintz could also see that the children were crying and afraid. No one in the vehicle attempted to flee or otherwise resist. And Mr. Pigott remained calm and compliant throughout the encounter.[4] Under these circumstances, any threat to Deputy Gintz ceased once the Pigotts complied with Deputy Gintz's commands and were subdued. *See Tucker*, 998 F.3d at 181–82; *Joseph*, 981 F.3d at 335.

Even if Mr. Pigott was not initially compliant, it is clear from Deputy Lacaze's body-camera footage that Mr. Pigott eventually followed Deputy Gintz's orders, as he is seen standing still, with his back towards Deputy Gintz and his arms raised above his head, displaying no signs of resistance. *See Hanks*, 853 F.3d at 746. Yet, despite the Pigotts' overall compliance and lack of resistance, Deputy Gintz never holstered his firearm until after Deputy Lacaze arrived. According to the Pigotts, Deputy Gintz instead

---

[4] While Deputy Gintz testified that Mr. Pigott initially did not follow his verbal instructions to show his hands, this fact is contested by the Pigotts who maintain that Mr. Pigott immediately complied with all of Deputy Gintz's commands.

opted to escalate the situation by continuing to brandish his firearm in a threatening manner, pointing it at the children and pressing it against the back of Mr. Pigott's head. *See Lytle*, 560 F.3d at 413; *Joseph*, 981 F.3d at 335; *see also Doss v. Helpenstell*, 626 F. App'x 453, 459–60 (5th Cir. 2015) (holding that an officer should receive no qualified immunity if he "quickly escalate[s]" an encounter with a nonthreatening, passively resisting driver who poses little risk of escape by employing overwhelming force "rather than continu[ing] to negotiate").

Deputy Gintz maintains that his version of events, which he claims does not support a finding of excessive force, is corroborated by the videotape captured from Deputy Lacaze's body-worn camera. He denies having ever pointed the gun at the children, between Mr. Pigott's eyes, and against the back of Mr. Pigott's head. He also denies having threatened to shoot Mr. Pigott in the back of his head or otherwise threatening to harm the Pigotts. While he confirms that he had his firearm drawn, Deputy Gintz asserts that he held it in a "low gun ready position" throughout the encounter. But the videotape did not capture the events preceding Deputy Lacaze's arrival. We thus must adopt the Pigotts' depiction of Deputy Gintz's conduct, *see Scott*, 550 U.S. at 378, 380, which raises a question of material fact as to these assertions, the amount of force Deputy Gintz used after the perceived threat dissipated, and whether the Pigotts were actively resisting.

Accordingly, a genuine issue of material fact exists as to whether the amount of force used by Deputy Gintz was objectively reasonable under the circumstances. "While the trier of fact might ultimately conclude that qualified immunity is warranted because reasonable officers could disagree" about whether holding the Pigotts at gunpoint "was not unreasonable under the circumstances, this decision should not be made at the summary judgment stage." *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005).

"Any credibility determination made between [Deputy Gintz's] and [the Pigotts'] version of events is inappropriate for summary judgment." *Id.*

2.

We now proceed to the second step of the qualified immunity inquiry. In granting Deputy Gintz's motion for summary judgment, the district court concluded that it did not violate clearly established law for Deputy Gintz to use "a moderate amount of non-deadly force (displaying his firearm) for the three-to-five minutes he waited, outnumbered, for backup to arrive, where no shots were fired and no one was arrested or physically touched." But the district court's ruling failed to consider all of the relevant facts, including that the Pigotts were compliant and not actively resisting or attempting to flee. In so doing, the court ignored our precedent that an officer may not use force— non-deadly or otherwise—on a person who is complying with the officer's commands, is not otherwise resisting, and poses no threat to the safety of others. *See, e.g.*, *Ramirez v. Killian*, 113 F.4th 415, 424–25 (5th Cir. 2024) ("An officer may not constitutionally use force on a non-threatening subject offering no resistance or merely 'passive' resistance."); *Bagley*, 90 F.4th at 803 (collecting cases to support holding that, as of May 2019, "it was clearly established that an officer may not use force on a [person] who is complying with his commands"); *Joseph*, 981 F.3d at 341 (holding that "continuing to inflict force despite [a suspect's] committing no crime, posing no threat, and giving no active resistance" violates clearly established law); *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) (holding that once a suspect is "subdued" and is "no longer resisting, an officer's subsequent use of force is excessive"); *Newman v. Guedry*, 703 F.3d 757, 761–64 (5th Cir. 2012) (holding that it was objectively unreasonable for an officer to use force when

the suspect "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command").[5]

That Deputy Gintz did not actually resort to the use of physical or deadly force does not alter this analysis. Drawing a gun constitutes use of force. *See Smith v. Heap*, 31 F.4th 905, 912 & n.7 (5th Cir. 2022) (noting that officers "approach[ing] a vehicle with weapons drawn" is a "use of force" and citing authority discussing same); *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir. 1998) ("A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 [excessive force] claim against him." (quoting *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986))). When, as here, an officer uses non-physical force, the plaintiff's lack of bodily injury is not determinative. *See Solis v. Serrett*, 31 F.4th 975, 982 (5th Cir. 2022) ("[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonable excessive force." (quoting *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017))). Rather, we look to the particular facts and circumstances of the case to determine whether it was reasonable for the officer to brandish his firearm. *See Crane*, 50 F.4th at 468; *Hinojosa v. City of Terrell*, 834 F.2d 1223, 1230–31 (5th Cir. 1988).

—————————————————

[5] While these cases did not involve an officer brandishing his firearm, we have held that "it is not necessary that the very action in question has previously been held unlawful . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Austin v. City of Pasadena*, 74 F.4th 312, 326 (5th Cir. 2023) (internal quotation marks and citations omitted). Given the weight of authority holding that an officer may not use force against a compliant, nonthreatening, and subdued subject, we find that Deputy Gintz had reasonable warning that brandishing his firearm in a threatening manner violated the Pigotts' constitutional rights.

Under the Pigotts' version of the facts, Deputy Gintz brandished his firearm for several minutes. He aimed his gun at both Mr. Pigott and the children, pointing it between Mr. Pigott's eyes and pressing the barrel against the back of Mr. Pigotts' head, all while he had his finger on the trigger. Deputy Gintz also threatened to "blow [Mr. Pigott's] . . . head off" if he failed to comply with Deputy Gintz's commands. Based upon the law of our circuit as it existed in April 2020, and viewing the evidence in the light most favorable to the Pigotts, it was objectively unreasonable to use such force against the Pigotts, who had committed only a minor traffic offense and were subdued, compliant, nonthreatening, and not actively resisting. *See Bagley*, 90 F.4th at 803 (collecting cases); *Castro v. Kory*, No. 23-50268, 2024 WL 1580175, at *4 (5th Cir. Apr. 11, 2024) (unpublished) (holding that, as of August 2018, it was clearly established that pointing a gun "at an unarmed, confused, and only mildly disruptive suspect" constitutes excessive force in violation of the Fourth Amendment); *see also Rosales v. Bradshaw*, 72 F.4th 1145, 1155–56 (10th Cir. 2023) (holding that a deputy's use of force when seizing a motorist for a minor traffic violation was excessive when the sheriff began shouting at him without identifying himself as law enforcement and pointed his weapon at the plaintiff, who remained calm and compliant); *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) (finding a Fourth Amendment violation when an officer brandished a cocked gun in front of the plaintiff's face and threatened to kill him and holding that "pointing guns at persons who are compliant and present no danger is a constitutional violation" (citation and internal quotation marks omitted)); *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (holding that an off-duty police officer's conduct in pointing his gun at a motorist's head and holding him and his teenage passengers at gunpoint for about two minutes was objectively unreasonable under the Fourth Amendment); *Stamps v. Town of Framingham*, 813 F.3d 27, 30 (1st Cir. 2016) (denying qualified immunity to

SWAT team member who continued to hold gun to a subdued plaintiff's head and holding that "pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation"); *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) ("An officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force."); *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (denying qualified immunity to officers accused of "pointing a gun at a compliant adult in a non-threatening situation"); *Robinson v. Solano County*, 278 F.3d 1007, 1010, 1015 (9th Cir. 2002) (en banc) (holding that police used excessive force in pointing their guns at an unarmed person with their hands up); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) (denying qualified immunity to officers who held plaintiffs at gunpoint after gaining control of situation).

Accordingly, the district court erred in concluding that Deputy Gintz is entitled to qualified immunity on the Pigotts' excessive force claim.

## B.

We next consider whether the district court erred in granting Deputy Gintz qualified immunity on the Pigotts' unreasonable seizure claim.

"Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One narrow exception announced in *Terry v. Ohio* is that "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (citing *Terry*, 392 U.S. at 30); *see also Hill*, 752 F.3d at 1033 ("The rule of *Terry* . . . represents a very narrow

exception." (citation and internal quotation marks omitted)).  Reasonable suspicion requires "more than an 'inchoate and unparticularized suspicion or hunch.'" *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quoting *Terry*, 392 U.S. at 27).  Instead, the officer must "point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime." *Hill*, 752 F.3d at 1033 (citing *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000)).  This inquiry turns on the "totality of the circumstances." *Garner*, 471 U.S. at 9.  To analyze the legality of a vehicle stop under *Terry*, we follow a two-step process.  First, we consider whether the officer was justified in stopping the vehicle at its inception, and second, we consider whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.  *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) (recognizing that whether a seizure is reasonable under the Fourth Amendment depends on the nature of the seizure and all of the circumstances surrounding it).

The parties agree that the Pigotts were "seized" when Deputy Gintz drew his weapon and commanded Mr. Pigott to get out of his truck.  The district court found that the entire encounter—from the time Deputy Gintz seized the Pigotts until Deputy Lacaze arrived and let them leave—lasted only eleven minutes.  Notably, the district court also found that "by the time the seizure occurred[,] Deputy Gintz had personally observed Mr. Pigott drive the wrong way down a one-way street, which ultimately gave Deputy Gintz reasonable suspicion to effect a traffic stop."  Thus, as to the first step

in our analysis, Deputy Gintz was justified in stopping the vehicle for the traffic violation.[6]

Regarding Deputy Gintz's actions after effectuating the stop, the Pigotts contend that Deputy Gintz unlawfully prolonged their detention and failed to diligently pursue a means of investigation "that would quickly confirm or dispel [his] suspicion." *United States v. Place*, 462 U.S. 696, 702 (1983); *accord United States v. Sharpe*, 470 U.S. 675, 686 (1985) (emphasis added); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Both parties agree that Deputy Gintz questioned Mr. Pigott about his truck pulling through the RPDC parking lot for the few minutes he was alone with the family. Once Deputy Lacaze arrived, he continued to question Mr. Pigott while conducting a pat-down search of Mr. Pigott. Deputy Lacaze then requested to see Mr. Pigott's driver's license so that he could run a computer check on it. Mr. Pigott also volunteered to have his truck searched, which lengthened the duration of the stop. The eleven-minute detention at issue here, as well as the questioning regarding possible illegal activity at the RPDC and the request to see Mr. Pigott's license, were reasonably related in scope to the circumstances that justified the stop. *See Pack*, 612 F.3d at 361–62 (holding that it was reasonable for officers to conduct a thirty-five-minute traffic stop for an initial speeding infraction of driving eight miles over the speed limit); *see also Brigham*, 382 F.3d at 507–08 (finding "no constitutional impediment to a law enforcement officer's request to examine a driver's license and

---

[6] On appeal, Deputy Gintz does not advance the argument that he had reasonable suspicion to effectuate the stop based upon his belief that the Pigotts had introduced illegal contraband into the RPDC. Instead, Deputy Gintz concedes that the criminal offense supporting the seizure was that Mr. Pigott drove the wrong way down a frontage road.

vehicle registration or rental papers during a traffic stop and to run a computer check on both" (citation and internal quotation marks omitted)); *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) (rejecting "any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation").

We therefore affirm the district court's conclusion that the Pigotts were not seized for an unreasonable amount of time and that Deputy Gintz's actions were reasonably related in scope to the circumstances that justified the stop.

## IV.

Accordingly, we REVERSE the district court's order insofar as it granted summary judgment to Deputy Gintz on the Pigotts' excessive force claim,[7] REINSTATE the Pigotts' state law claims over which the district court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a), and REMAND for further proceedings consistent with this opinion. We AFFIRM the district court's findings as to the Pigotts' unreasonable seizure claim.

---

[7] To the extent that Mya and K.P. allege bystander excessive force claims, we also reverse the district court's holding that such claims are not cognizable under § 1983. "Bystander excessive force claims can only succeed when the officer directs the force toward the bystander—that is to say, when the bystander is not really a bystander." *Harmon v. City of Arlington*, 16 F.4th 1159, 1168 (5th Cir. 2021). Because some of Deputy Gintz's activities were directed towards the children, their bystander liability claims may proceed. *See id.* (analyzing *Coon v. Ledbetter*, 780 F.2d 1158, 1160–61 (5th Cir. 1986)).